Rush PETTWAY et al., etc., Plaintiffs-
Appellants,

v.

AMERICAN CAST IRON PIPE COMPA-
NY, Defendant-Appellee,

United States Equal Employment Oppor-
tunity Commission, Intervenor.

No. 73–1163.

United States Court of Appeals,
Fifth Circuit.

April 29, 1974.

Rehearing and Rehearing En Banc
Denied May 22, 1974.

Bell, Circuit Judge, concurred spe-
cially and filed opinion.

Oscar W. Adams, Jr., Birmingham, Ala., Robert Belton, Charlotte, N. C., Jack Greenberg, Barry L. Goldstein, New York City, for plaintiffs-appellants.

Gerald D. Letwin, E. E. O. C., Washington, D. C., amicus curiae.

J. R. Forman, Jr., Samuel H. Burr, Birmingham, Ala., for defendant-appellee.

Before TUTTLE, BELL and GOLDBERG, Circuit Judges.

TUTTLE, Circuit Judge:

. This complex, class action employment discrimination suit was filed on May 13, 1966 under the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S. C.A. § 2000e et seq., and 42 U.S.C.A. § 1981. The racial discrimination charges are derived from complaints filed on November 22, 1965 with the Equal Employment Opportunity Commission.

### Introduction

Although the path of this law suit is strewn with the corpses of intermediate decisions,[1] the posture of the present cases on appeal will hopefully allow final resolution. In order to accomplish this the opinion must unfortunately be long and complex.

On July 22, 1969 plaintiffs requested a restraining order to prevent the defendant from vacating the offices of several black employees on the Auxiliary Board, a company governing board composed of black employees, and a declaratory judgment that segregation of black and white employees on two governing boards is in violation of Title VII, 42 U.S.C.A. § 2000e et seq. The district court agreed with the plaintiffs and directed the defendant to prepare a plan to eliminate the racial restrictions on the Board of Operatives, the Board of white employees, and to disestablish the separate black Auxiliary Board. The court adopted the defendant's reorganization plan, overruling the objections filed by the plaintiffs. 332 F.Supp. 811 (N.D.Ala.1970).

When the employee discrimination charges were tried in October, 1971, the district court held that the testing conducted by the company did not pass muster under Griggs v. Duke Power Company, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and had an *adverse impact* on the employment opportunities of black employees. The district court, nevertheless, then denied all requested relief, except for an award of attorney's fees and costs.

The plaintiffs-appellants appeal from these two decisions on the following grounds: (1) refusal to enjoin the company from requiring improper test and educational requirements, (2) failure to require restructuring of the departmental seniority system and the posting and bidding procedure for job vacancies based on the departmental seniority system, (3) failure to order red circling and advance entry for discriminatees,[2] (4) refusal to require changes in the apprenticeship and on-the-job training in the crafts programs, (5) refusal to remedy unlawful exclusion of blacks from supervisory positions, (6) granting inadequate relief in desegregating the company's employees management board, and (7) failure to award back pay.

Defendant-appellee, American Cast Iron Pipe Co., incorporated under the laws of the State of Georgia with its

---

1. In addition to the suits under discussion, the following actions have evolved. The district court dismissed the initial complaint on March 10, 1967 because the EEOC had failed to attempt conciliation prior to the filing of the case with the district court. On appeal with several other actions, we reversed. Dent v. St. Louis-San Francisco Railway Co., 406 F.2d 399 (5th Cir. 1969). During the pendency of appeal, the defendant discharged one of the named plaintiffs.

After the district court denied relief to this plaintiff, we reversed, directing the district court to order that this plaintiff be reinstated, back pay be awarded, and any necessary protective orders be issued. Pettway and Wrenn v. American Cast Iron Pipe Co., 411 F.2d 998 (5th Cir. 1969).

2. The terms "red circling" and "advance entry" will be defined in the discussion *infra*.

principle place of business in Birmingham, Alabama, is engaged in the production of cast iron and ductile ironpipe and fittings and various other miscellaneous cast iron and steel products. As of August 12, 1971, the company employed 2,551 persons of whom 927 were black.[3]

Plaintiffs-appellants have brought this action on their own behalf and on the behalf of other persons similarly situated pursuant to Federal Rules of Civil Procedure 23(b)(2).[4] The class of persons represented by plaintiffs-appellants are "those negro employees of defendant employed as of May 13, 1966 and negro persons who have been employed subsequent to May 13, 1966 who have been, continued to be, or in the future will be denied equal employment opportunities by defendant on the ground of race or color."[5]

As discussed *supra,* appellants are requesting extensive relief from the present impact of past intentional discrimination and illegal testing and educational requirements utilized by the company-defendant from December, 1964 until March 25, 1971, relief from certain present discriminatory practices, and relief from the inadequate remedy granted by the district court desegregating the employee management boards. The district court denied their requests. We reverse in part, affirm in part, and remand.[6]

## I. COMPANY ORGANIZATION AND EMPLOYMENT PRACTICES

### A. *Company Organization*

1. *Departments.* The company's operations are organized into various departments. There are five primary production departments, each having separate and distinct functions from the other. They consist of: (1) the mono-cast department containing three pipe shops for the production of cast iron and ductile iron pipe; (2) the fittings foundry which produces between 35,000 to 40,000 different accessories to complement the pipe produced in the pipe shops; (3) the steel foundry which produces steel tubes and castings of various alloys and shapes; (4) the melting department which melts all of the hot metal required by the mono-cast department, the fittings foundry, and the steel foundry; (5) the steel pipe foundry which produces steel pipe from steel skelp. In addition, there is a machine shop which performs all the labor required on items produced in the steel foundry, the fittings foundry, and the mono-cast department, as well as replacement maintenance on all machinery. Four of these departments—all except the steel pipe foundry and the machine shop—have employed the majority of black employees within the company between 1963 and 1971.

The company also has service departments consisting of the general yards department, central stores, the shipping

---

3. The company employed 1,792 persons in 1965, approximately equally divided between blacks and whites. The total employment for the company enjoyed continual increase up to 1970. The number of blacks employed, however, decreased until 1969 and in August, 1971 only slightly exceeded the 1965 level, while the number of white employees had almost doubled.

4. In their original complaint, plaintiffs had filed their class action pursuant to Rule 23(b)(3). Under an order of the district court requiring that the class alleged be defined clearly and particularly, the plaintiffs amended their complaint to allege a Rule 23(b)(2) class action and presented a list of names of the members of the class, to the best of their knowledge, to the district court.

5. From this statement from plaintiffs' amended complaint defining the class represented, it is clear that we are *not* concerned with discriminatory *hiring* procedures and their remedy.

6. Our holdings and the relief directed are granted both under Title VII and section 1981 unless otherwise stated.

department, electrical department, maintenance department, inspection department, and the construction department. These departments perform services in the receipt of raw materials, the shipment of finished products, and various maintenance functions in the company's operations. Of these departments, the general yards, shipping, and construction departments have had substantial numbers of black employees.[7] The machine, electrical, maintenance, and inspection departments consist principally of the higher skilled jobs and craft positions with a small turnover in personnel. Fewer blacks have been employed in these departments.[8]

2. *Wage progression and advancement.* The method of advancement within these departments is a wage progression schedule, a ladder of pay groups, embracing one or more jobs. The company alleges that these are job-to-job sequences with functional relationship. The appellants argue that the company admitted that no formal, functional lines of job progressions have ever been maintained. Until 1968 the company maintained twenty-three pay groups, but on February 19, 1968, the structure was consolidated into fifteen pay groups: (a) groups 1–8 include the unskilled and semi-skilled functions; (b) groups 9 and 10 contain the more semi-skilled positions; (c) group 11 is the skilled non-craft, technical and clerical positions; (d) groups 12 and 13 are the skilled craft and technical jobs; (e)

group 14 includes the secondary supervisory, and group 15, the primary supervisory positions (leadmen and foremen). The district court found that "the overwhelming majority of the black employees historically were and continue to be employed in the *pay groups 1–8 jobs* in the various departments and particularly in the mono-cast 1, 2, and 3, and foundry." (Emphasis added).[9]

## B. *Employment Practices*

■ 1. *Intentional discrimination.* Until 1961 the company formally maintained exclusively black jobs and exclusively white jobs.[10] Departments were not totally segregated, but there were predominantly black and predominantly white departments. When Presidential Executive Order No. 10925 made such a policy unlawful in 1961, the company terminated this practice. The resulting employment segregated profile, however, was preserved until 1963 by economic conditions requiring lay-offs and subsequent rehiring of laid-off workers. The process of lay-off and rehiring meant that any movement of black employees into traditional white jobs would come to an end. As lay-offs occurred, the employees with the least *departmental* seniority, *e. g.* the newly hired, promoted, or transferred black employees, would be either (1) furloughed, if newly hired, or (2) dropped back into the department from which they transferred, as they re-

---

7. See chart B *infra.*

8. See chart B *infra.*

9. Plaintiffs' exhibit 6, "total number of employees by race within each pay group as of August 15, 1971" (two months before trial), indicates pay group stratification along racial lines. Over 95% of the company's black employees' work in pay groups 1–8 jobs, while only 30% of white employees hold these positions. See chart C *infra.*

10. Discrimination prior to the effective date of Title VII, July 2, 1965, can be considered under two theories. Since the appellant's allegations are also made under 42 U.S.C.A.

§ 1981, employment practices prior to 1965 may be examined. Secondly, this court specifically explained in United States v. Jacksonville Terminal, 451 F.2d 418, 441 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S. Ct. 1607, 31 L.Ed.2d 815 (1972), and affirmed in Burns v. Thiokol Chemical Corp., 483 F.2d 300 (5th Cir. 1973), that pre-act discriminatory conduct is highly relevant, especially, when considering neutral practices under Title VII alleged to carry forward past discriminatory effects. *See* United States v. Dillon Supply Co., 429 F.2d 800 (4th Cir. 1970).

tained former departmental seniority in that department for lay-off purposes.[11] As production increased in 1964, and re-employment of blacks might normally be expected to increase, the company instituted its illegal testing and educational requirements. As of 1963 black employees constituted about half the work force of the company, but only three blacks earned more than any white production workers, and few if any jobs had racially mixed staffing.

2. *Hiring.* Sometime prior to 1960, the company had instituted a hiring requirement of a high school education or its equivalent for all white applicants. By 1960 white applicants were also required to pass a screening test battery and a physical examination. Black applicants employed prior to 1964 were only required to pass the physical examination. In 1964, after a compliance review under Order No. 10925 by the Department of Army and Office of Federal Contract Compliance, the company was informed that to be eligible for federal contracts it could no longer maintain different standards for hiring black and white applicants. The company at that time extended the testing and education criteria to black applicants. These standards for *hiring* remained in effect until 1971. However, the company eliminated test requirements as well as the criterion of a high school education or its equivalent for hiring into pay groups 1–8 on July 14, 1969.[12] The failure of blacks successfully to hurdle these qualifying barriers had resulted, between 1965 and 1969, in the decrease in the number of black employees in the plant from 869 to 791, while the number of white employees increased from 923 to 2,162.[13]

3. *Promotion and transfer.* In December, 1964, the company initiated a testing requirement for promotion within or between any pay groups and for *transfer* between departments.[14] Achievement levels (test cut-off scores) were established using the California Survey of Mental Maturity Tests. To be eligible for position in a particular pay group, an employee had to obtain a test score corresponding to the specified achievement level. The company determined that the tests' recommended national norms were too high for the company's purposes. Therefore, the company in an effort to establish its own standards of norm selected 100 average performers from its employees to take the test. This was used to determine what achievement levels to assign to various jobs within the company's pay grades. Ninety-eight of the 100 selected employees took the test. Seventy-five were black; and twenty-three were white. This testing program for promotion was reviewed by Dr. Brimm of the Department of Army and Office of Federal Contracts Compliance and praised as one of the best systems in the companies he had visited on compliance reviews.

On February 19, 1968, the company eliminated the testing criterion for promotion within the first eight pay grades.[15] In addition to employee com-

---

11. We note that in Rowe v. G. M. C., 457 F.2d 348, 357–358 (5th Cir. 1972), this court rejected this as an ameliorating variable justifying a seniority system which, during the "ebb and flow" of lay-offs and rehiring, required black employees to once again "go to the foot of the line."

12. The company thought it would be in a better position, as a participant in the national program, to employ persons among the hard core unemployed.

13. The black/white ratio went from just under 50/50 to about 25/75.

14. The testing program for promotion was carefully explained to all employees. It was solely voluntary. And employees were allowed to retake the test every twelve months to attempt to improve their achievement level. In addition to the testing, departmental seniority was a factor in determining promotion.

15. The company, however, continued to require testing for *new hires* in pay groups 1–8 until July 14, 1969, as well as the requirement of the high school educational or its equivalent.

plaints concerning these testing requirements, the company determined that ability of employees to perform functions in these pay grades could be established by on-the-job observation without detriment to the company. Requisite achievement levels for hiring and for promotion or transfer within or without a department to positions in pay groups 9–15 were retained, however. The company eliminated all testing in March, 1971. Currently, the company simply tries the person, selected under the bidding procedure on the basis of departmental seniority or plant seniority and ability, on the job and evaluates his performance in determining the promotion.

4. *Testing and educational requirements.* A testing prerequisite was required for hiring, promotion and transfer, and entry into the apprentice and on-the-job training programs. A high school education or its equivalent was a criterion, as well, for being hired or entry into the apprentice program.

Concerning the testing conducted by the company, the district court concluded:

> The history of the testing, as they existed and were administered by defendant from July 2, 1965,[16] to March 25, 1971, recorded in the findings of fact, *supra*, is convincing that they were not discriminatorily applied to defendant black employees. *Their adverse impact on the employment opportunities of blacks is equally clear*. Judged by the standard established by Griggs v. Duke Power Company, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), they could not pass muster. (Emphasis added).[17]

The Supreme Court in facing a high school education and testing requirement in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), stated:

> . . . The Act [Title VII] proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited.

> On the record before us, neither the high school completion requirement nor the general intelligence test is shown to bear a demonstrable relationship to successful performance of the jobs for which it was used. Both were adopted, as the Court of Appeals noted, without meaningful study of their relationship to job-performance ability.

> \* \* \* \* \* \*

> . . . [B]ut good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as "built-in headwinds" for minority groups and are unrelated to measuring job capability.

> The Company's lack of discriminatory intent is suggested by special efforts to help the undereducated employees through Company financing of two-thirds the cost of tuition for high school training. But Congress directed the thrust of the Act to the *consequences* of employment practices, not simply the motivation. More than that, Congress has placed on the employer the burden of showing that any given requirement must have a mani-

---

16. We note that although the district court specifies July 2, 1965, it also stated that the testing for promotion purposes began in December, 1964. Discriminatory employment practices prior to the effective date of Title VII, July 2, 1965, are relevant in determining allegedly present effect from past discrimination. See note 10, *supra* at 7.

17. It is unclear whether the district court meant both the testing and educational requirements or just the testing. The EEOC guidelines define testing to *include* an educational requirement. 29 C.F.R. § 1607.2.

fest relationship to the employment in question. 401 U.S. at 431–432.

■ The appellees do not challenge the district court's conclusions under *Griggs* concerning their testing. We affirm and will discuss more fully the grounds supporting the court's decision. The testimony both by appellants' witnesses and the company's witnesses indicated that the testing and educational requirements had resulted in fewer black employees being employed between 1965 and 1969 and fewer black employees being promoted between 1965 and 1971. The statistics from these periods depict the same *prima facie* pattern, and support the district court's conclusion of adverse effect.[18] This disproportionate impact on black applicants and employees shifts the burden of demonstrating job-relatedness to the company under *Griggs*.

The company made no attempt to validate any of the number of tests utilized,[19] except the California Test of Mental Maturity. The trial court found this showing inadequate under *Griggs*. We concur.

In United States v. Georgia Power Co., 474 F.2d 906 (5th Cir. 1973), this Court passed specifically on the proper validation procedure for employment tests. Although recognizing that "a test is not valid or invalid *per se,* but must be evaluated in the setting in which it is used" (*Id.* at 912), we note that the company has at no time attempted to validate its tests under the EEOC guidelines, 29 C.F.R. 1607, CCH Employment Practices ¶ 4010, which we found mandatory in *Georgia Power*.[20] The company's efforts to establish achievement levels which have a relationship to job performance are less acceptable than the procedure held inadequate in *Georgia Power*.[21] *Id.* at 912–918.

Although it is unclear whether the district court ruled on the high school education standard for *hiring* purposes,[22] we think that this educational requirement cannot "pass muster" under *Griggs,* either.[23] Johnson v. Good-

---

18. We discuss extensively the testimony and the statistics *infra.* Charts A, B, C, D, and E, *infra* should be examined.

19. For promotion and transfer purposes, beginning in 1964, the district court found that the company utilized the California Test of Mental Maturity. The record indicates that this test or a shortened excerpt from it was also used as one of the primary determinants for hiring and entry into the apprentice and on-the-job training programs. An aptitude test was additionally required for a craft rate (pay groups 12 and 13) or equivalent job, *e. g.* apprentice and on-the-job training programs.

20. This Court stated:
 "This requirement to treat the guidelines as expressing Congressional intent obviously was intended as an answer to the question at issue in *Griggs*—When can tests, which are shown to have discriminatory results, be used? . . . Nevertheless, these guidelines undeniably provide a valid framework for determining whether a validation study manifests that a particular test predicts reasonable job suitability. Their guidance value is such that

we hold they should be followed absent a showing that some cogent reason exists for noncompliance." 474 F.2d at 913.

21. We recognize that the validation procedure of the California Test of Mental Maturity set forth at trial by the company was conducted in 1964, before the *Griggs* or the *Georgia Power* decisions. However, the company asserted at trial that this procedure and the approval of Dr. Brimm of the Office of Federal Contract Compliance satisfied the legal standard for employment testing. Since *Griggs* and *Georgia Power* are the legal standards, we cannot agree that they have been met.

22. Since the high school education, or its equivalent, criterion for entry into the apprentice program is an open issue on this appeal, we will postpone analysis until II (B) (1) and III (A).

23. The Supreme Court in *Griggs* stated:
 "History is filled with examples of men and women who rendered highly effective performance without the conventional badges of accomplishment in terms of certificates, diplomas, or degrees. Diplomas

year Tire & Rubber Co., 5 Cir. 491 F.2d 1364 [No. 73–1712 March 27, 1974]; United States v. Georgia Power Company, 474 F.2d at 918–919; United States v. Consolidated Copper ·Co., 6 EPD ¶ 8918 (D.Ariz.1973).

Given the adverse effect, the company had the burden of showing *job relatedness*. As we stated in *Georgia Power:*

> There [in *Griggs*], the court explicitly held that the use of a high school requirement which has a disproportionate racial impact and has not been proven to be a predictor of ultimate job success controverts the congressional mandate of Title VII.[14] As with Georgia Power's testing program, *supra*, the issue here is whether or not the company has made a sufficient showing to manifest a relationship between its educational requirement and its job characteristics. 474 F.2d at 918.[24]

The company offered *no evidence* to satisfy this burden.

Lastly, we wish to point out here, as was true also in *Georgia Power*,[25] a large percentage of the current employees (August 12, 1971), 56% of the black employees and 12% of the white employees, are enjoying job success without a high school diploma.[26] *See* Griggs v. Duke Power Co., 401 U.S. at 431–432.

The company ended its formal policy of segregation of black and white jobs in 1961, although its immediate effect lingered until 1963. The improper testing for hiring, promotion and transfer, and admittance into the apprentice and on-the-job training programs, as well as the educational criterion for hiring were terminated on March 31, 1971. We have affirmed the district court's holding that the testing, and ourselves have found that the educational criterion, fail under the standards of *Griggs*. We agree with the district court that these discriminatory practices had an "adverse impact on the employment opportunities of blacks." The issues are now three-fold: (1) Did the district court err in denying an injunction against the future imposition of testing and educational standards? (2) If there is present effect in the company's neutral employment practices as a result of the past discrimination, what relief is required? and (3) Are there continuing, present discriminatory practices?

## II. PRESENT ADVERSE EFFECT AND PRESENT DISCRIMINATION

Appellants assert that the consequence of the past intentional exclusion and of the illegal testing and educational standards is currently carried forward by: (1) the neutral practices of the departmental seniority and the bidding and posting procedure which determine promotion; (2) the age requirement for entry into the apprentice program, which black employees who were denied this opportunity in the past cannot now meet; and (3) the departmental bidding utilized for the selection of on-the-job trainees. In addition, the continued educational prerequisite for entry into the apprentice program and the purely subjective criteria to be applied by all-white department superintendents for

---

and tests are useful servants, but Congress has mandated the commonsense proposition that they are not to become masters of reality." 401 U.S. at 433.

**24.** In note 14, the Court pointed out that such an educational requirement, also, ran afoul of the Equal Employment Opportunity Commission's guidelines. The EEOC defines "testing" to include an educational criterion and requires similar validation. 29 C.F.R. §§ 1607.2, 1607.4.

**25.** 474 F.2d at 918–919.

**26.** For example, there are seventy-five white employees who without completion of a high school education make over $4.00 an hour. As chart E *infra*, indicates, $4.00 an hour is well above the average pay rate in most departments.

selection of supervisory personnel are challenged as present discriminatory practices.

### A. *Promotion—The Seniority System and Posting and Bidding Procedure*

1. *Effect of present neutral practices.* Beginning January 1, 1971, the company instituted a policy of posting vacancies above pay group 3 and adopted a bidding procedure for filling these vacancies.[27] The job vacancies are first posted for bidding for three days *within the department.* Basic qualifications, i. e. ability, and *departmental* seniority control the selection from the bidders. If no qualified employee within the department bids, then the company posts the vacancy plant-wide. A transferring employee retains his former seniority for purposes of returning to his former department in case of lay-off within the new department. But he does not carry over any of his accumulated seniority for purposes of departmental promotion —a basic unit or job seniority type.[28] *See* Note, Title VII, Seniority Discrimination, and the Incumbent Negro, 80 Harv.L.Rev. 1260, 1263–66 (1967).

Because of the company's wage progression structure, a transferring employee may move from a higher to a lower paying position.[29] In fact, an employee who has progressed substantially within pay groups in one department and then transfers to a different department to enhance his chances for eventual advancement, higher pay, or better working conditions will usually be required to endure a loss of seniority and a wage cut as a condition of transfer.

Appellants assert that invidious discrimination prior to 1963, and the illegal testing and educational requirements from 1964 through 1971, have resulted in racial stratification between departments and jobs within departments (and consequently in salary). This stratification is a manifestation of these past practices which have (1) excluded the majority of black workers from positions in predominantly white departments thereby absolutely preventing their obtaining of seniority there; and (2) if not excluded, deferred initial entry into these departments, thereby curtailing the seniority of black employees in these departments and hampering their promotion to higher paying positions. Therefore, appellants' argument is that this stratification of black employees into the lower paying departments and jobs, caused by *past* discriminatory practices, is *presently* effectuated through the departmental seniority system and bidding and posting procedure.

The departmental seniority system has this locking-in effect because the black transferee would have to forfeit seniority and pay rate[30] in order to transfer

27. Before 1971 the company did not have a systematic written procedure for filling vacancies. Promotions within a department went to the senior department employee in the pay group at the immediately lower level. Departmental superintendents, who were all white, determined which employee got the promotion. Evidently, the company discouraged transfers between different departments. Promotions within a department and transfers to pay group 9 or above, of course, were still subject to the testing standards until March 25, 1971.

28. The district court stated that a transferring employee is given one year's credit for wage progression purposes, and, also, permitted credit for any training or past experience for a job within the higher pay group which he has now obtained.

29. *See* note 30, *infra* at 223.

30. For purposes of wage rate progression *only*, a transferee is allowed one year's credit. For promotion, lay-offs, or reductions in force, a transferee is treated within the department as a "new man."

The retention of one year's credit for pay group purposes does not reduce substantially the deterrence to transfer of this class of black employees because their employment with the company extends over a long period of time. For example, a list of 623 class members was submitted to the district court in 1969. Even then, *four years ago,* these employees had substantial plant-wide seniority. Further, every employee has to serve a six month probation period before being eligible for a promotion.

and because the black transferee to a predominantly white department would be unable to compete equally for promotion based on departmental seniority with a white employee, in the department at the time of the transfer, of equal or less *plant* seniority. Black employees within predominantly white departments, who were unable to gain entry into the department prior to 1971, because of their race, as swiftly as white workers, would also be harmed in greater proportion by lay-offs or reductions in force.[31]

Under the bidding and posting procedure, only if no qualified employee *within* a department bids after three days is a vacancy posted plant-wide. This process continues to freeze in the stratification in two ways. First, those black employees previously excluded from the higher paying departments because of their race will be denied these promotion opportunities in favor of those white employees *in the department*. Secondly,

those black workers, who, although deterred because of their race, have obtained a foothold in a predominantly white department cannot compete equally on the basis of departmental seniority with white employees, who were able to gain entrance to the department earlier.

Therefore, conclude appellants, the departmental seniority system deters black employees from transferring because of the inhibitors of losing seniority and pay grade while the bidding and posting procedure most often prevents even the consideration of the majority of black workers for a position within a predominantly white department. And both practices operate to handicap black employees in intra-departmental promotion for the higher paying, skilled jobs.[32] We agree with appellants that if past discriminatory employment practices have resulted in racial stratification in pay, jobs, and departments, the present effect is to lock in, as discussed above, black employees.[33]

31. The court in United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971), aptly described these hurts:

"In order to transfer to a formerly 'white' department these employees were required to suffer an economic penalty, forfeiture of seniority rights and pay levels earned in the 'black' department. The former was due to the use of departmental seniority, the latter to the fact that the transferee's new job was at a low paid entry level in the new department. Thus, to obtain an opportunity that had been denied them because of race, these employees had to be willing to give up what was already theirs because of service in the plant. Second, a transferee to a 'white' department would never be able to reach the level of a white employee already there. For example, if a black and a white employee had been hired at the same time and the latter had been assigned to the more desirable 'white' department, but the black had not been so assigned, the white started to accumulate department or unit seniority in that department but the black did not. Even if the black was given the chance years later to transfer into the 'white' department, the earlier discriminatory job assignment had denied him the chance to earn seniority up to that time in the 'white' department. Therefore, the use of departmental

or unit seniority for purposes of promotion in the formerly 'white' department continued the effect of the earlier discriminatory practice." *Id.* at 658.

*See* United States v. N. L. Industries, Inc., 479 F.2d 354, 358–366 (8th Cir. 1973); United States v. Jacksonville Terminal Co., *supra*, 451 F.2d at 453.

32. A unit seniority system, by its nature, allows the most advantages to employees with the greatest unit seniority. *See* Cooper and Sobol, Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598, 1603 (1969).

33. Johnson v. Goodyear Tire & Rubber Co., *supra*, 491 F.2d 1364; Bing v. Roadway Express, Inc., 485 F.2d 441 (5th Cir. 1973); Head v. Timken Roller Bearing Co., 486 F. 2d 870, 875–876, n. 7 (6th Cir. 1973); United States v. N. L. Industries, Inc., *supra*, 479 F.2d at 358–366; United States v. Georgia Power Co., *supra*, 474 F.2d 906, 926–927; United States v. Jacksonville Terminal Co., *supra*, 451 F.2d 418; Long v. Georgia Kraft Co., 450 F.2d 557 (5th Cir. 1971); Robinson v. Lorillard Corp., 444 F.2d 791, 795–800 (4th Cir. 1971), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980 (5th Cir. 1969); Stamps v. Detroit Edison

2. *Effect of past discriminatory practices*. The next step is to determine whether there was racial segregation along pay, job, and department lines. While there was substantial *viva voce* evidence on the issue of the impact of past discriminatory practices, the appellants primarily relied on statistical evidence. Introducing black/white comparative employment statistics from 1963, 1965, 1969, and 1971, dealing with salary, jobs, and departments, the appellants demonstrated a pattern of racial stratification between departments and within departments by the derogation of black employees into the lower paying, non-skilled pay groups. This statistical pattern considered in light of the past intentional discrimination and the illegal testing requirement, coupled with the hurdles to black employees presented by the departmental seniority system and the handicaps under the bidding procedure, present a *prima facie* case of present effect of past discrimination in the company's promotion and transfer process.[34] *Cf.* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800–807, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In relying on this method of statistical proof, we first examine the total black/white em-

---

Co., 365 F.Supp. 87 (E.D.Mich.1973) ; United States v. Virginia Electric and Power Company, 327 F.Supp. 1034 (E.D.Va.1971) ; Quarles v. Philip Morris, Inc., 279 F.Supp. 505 (E.D.Va.1968).

34. Statistical evidence in Title VII cases has often been given critical weight in this Circuit, Johnson v. Goodyear Tire & Rubber Co., *supra*, 491 F.2d at 1371–1373; Ochoa v. Monsanto Co., 335 F.Supp. 53 (S.D.Tex. 1971), aff'd per curiam, 473 F.2d 318, 319 (5th Cir. 1973) ("Accord statistical evidence great and oft-times decisive weight") ; Rowe v. General Motors Corporation, *supra*, 457 F.2d at 356–358 (statistics have "critical, if not decisive, significance—certainly at least in putting on the employer" the burden of justifying the disparity) ; United States v. Hayes International Corp., 456 F.2d 112, 120 (5th Cir. 1972) ("these lopsided ratios are not conclusive proof of past or present discriminatory hiring practices; however, they do present a *prima facie* case.") ; United States v. Jacksonville Terminal Co., *supra*, 451 F.2d at 424–436, 441–442 (5th Cir. 1971) ("although the statistics do not establish a *prima facie* case of discrimination, . . . absent explanatory evidence in testimony, the statistics indicated that officials have impliedly equated job qualifications with race.") ; United States v. Hayes International Corp., 415 F.2d 1038, 1043 (5th Cir. 1969) ("the employment statistics discussed, *supra*, . . . amply demonstrated a preliminary showing that the company's hiring practice violated Title VII."). Other circuits agree, Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377, 1382 (4th Cir. 1972), cert. denied, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972) ; Carter v. Gallagher, 452 F.2d 315 (8th Cir. 1971), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972) ; United States v. Ironworkers Local 86, 443 F.2d 544, 550 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971) ; United States v. National Lead Co., 438 F.2d 935 (8th Cir. 1971) ; Parham v. Southwestern Bell Telephone Co. 433 F.2d 421, 426 (8th Cir. 1970) ; Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 247 (10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971). *But see*, Heard v. Mueller Co., 464 F.2d 190 (6 Cir. 1972) ; Russell v. American Tobacco Co., 374 F. Supp. 286, 5 EPD ¶ 8447 (M.D.N.C.1973). *See generally*, Fiss, A Theory of Fair Employment Laws, 38 U.Chi.L.Rev. 235, 268–81 (1971).

The courts have most often utilized this empirical proof in discriminatory hiring situations. The courts have based a finding of adverse impact on data showing the percentages of blacks and whites hired as compared to the percentages of each in the available population. The statistical disparity is held to create a *prima facie* showing of discriminatory impact and thus invokes a requirement that the job relatedness of the overall selection process be established. *E. g.*, United States v. Hayes International Corp., *supra*, 456 F.2d at 120; United States v. Ironworkers Local 86, *supra*. Some courts have gone a statistical step further. The Eighth Circuit in *Parham, supra*, ruled that a gross disparity between the number of minority workers in an employer's work force (less than 2%), and the number in the overall population (21% of the state population) can prove discrimination *"per se." See* Rios v. Enterprise Association Steamfitters, Local 638, 326 F.Supp. 198 (S.D.N.Y.1971).

ployment figures for the years 1963, 1965 through 1971. Between 1965 and 1969, the period when the testing and educational requirements were prerequisites for all pay groups, the number of black workers decreased from approximately one-half to one-third of the company's work force, correspondingly the number of white employees increased. The company admitted and the district court [35] found that this decrease resulted

Chart A: Employment Totals by Race

| YEAR | BLACK | WHITE |
|------|-------|-------|
| 1963 | 878 | 797 |
| 1965 | 869 | 923 |
| 1966 | 845 | 1606 |
| 1967 | 820 | 1766 |
| 1968 | 798 | 1878 |
| 1969 | 781 | 2162 |
| 1970 | 1121 | 2115 |
| 1971 | 927 | 1624 |

from the impact of the testing and educational requirements.[36] It was not until 1969-70, when the company dropped its testing and educational requirements for jobs in the 1-8 pay groups, that the percentage of black employees for the company began to increase. By 1970, 1971 the company's work force again was approximately 50% black.

Testimony by company officials and a finding by the district court establish what the empirical proof clearly reveals, a substantial disparity in the number of blacks hired between 1964 and 1969 when testing and educational standards were required for all pay grades. Since the same test, California Test of Mental Maturity, was employed both in the determination for hiring and for promotion, its adverse impact on black appli-

cants is highly relevant in weighing its adverse impact on the promotional opportunities of black employees.

Hiring statistics indicate that black applicants fared substantially worse than white applicants on the testing. So too the actual achievement of black workers on the mental maturity test reveal lower scoring than white employees of the company as of September, 1971. For example, in the five departments [37] containing 80% of the black workers, the black employees' scores averaged in the 0-9, 10-19, or 20-29 percentile while white employees' scores averaged in either the 40-49 or 50-100 percentile in *every* department.

Having observed that black employees performed less well on the tests than white employees, we must make a comparison of the black/white employment data by departments and within departments by pay rate to discover if the impact of the illegal testing (scoring lower) was to lock black workers into lower paying, non-skill departments and lower paying jobs in all departments. The statistics from 1963 to 1965 indicate almost complete stratification of black employees within the non-craft departments, mono-cast, fittings foundry melting, bolt, shipping, steel foundry, and general yards, and white employees in the more craft oriented, highly skilled departments, maintenance, machine shop, electrical, inspection, and steel pipe. Within departments, black employees occupied predominantly the 1-8 pay groups and white employees the 9-15 pay groups.[38]

35. The district court stated:
 "During the 1964-69 period, when all applicants were subject to the educational and testing standards, more whites than blacks were employed because a greater percentage of black applicants were unable to meet these requirements."

36. There was no allegation that this resulted from fewer black applicants. We take judicial notice of the substantial black population of Jefferson County, Alabama and Birmingham, Alabama from whence the company draws most of its work force.

37. These departments were mono-cast (370 black, 314 white), foundry (245 black, 304 white), melting (77 black, 112 white), machine shop (50 black, 380 white), steel foundry (36 black, 55 white).

38. See the district court's findings *infra* at 227.

Chart B: Employees By Department
And Race

| Department | 1/1/63 B | 1/1/63 W | 1/27/65 B | 1/27/65 W | 9/19/69 B | 9/19/69 W | 8/15/71 B | 8/15/71 W |
|---|---|---|---|---|---|---|---|---|
| Mono-Cast | 359 | 104 | 311 | 138 | 343 | 338 | 369 | 310 |
| Fittings Foundry | 234 | 185 | 242 | 234 | 222 | 344 | 245 | 296 |
| Melting | 60 | 26 | 67 | 70 | 74 | 107 | 77 | 108 |
| Maintenance | 9 | 67 | 9 | 74 | 6 | 87 | 9 | 90 |
| Technical Division | 6 | 25 | 6 | 51 | 6 | 60 | - | - |
| Bolt Department | 30 | 21 | 24 | 13 | 27 | 33 | 29 | 37 |
| Shipping Department | 35 | 21 | 40 | 19 | 22 | 31 | 30 | 34 |
| General Yards | 15 | 12 | 14 | 13 | 17 | 18 | 19 | 20 |
| Construction | 20 | 25 | 19 | 33 | 26 | 42 | 27 | 56 |
| Steel Foundry | 35 | 28 | 34 | 65 | 32 | 58 | 36 | 51 |
| Plant Protection | 0 | 13 | 0 | 13 | 1 | 15 | - | - |
| Engineering | 0 | 2 | 0 | 3 | 0 | 2 | 0 | 2 |
| Finance Division | 4 | 16 | 4 | 6 | 3 | 5 | 3 | 4 |
| Personnel | 19 | 2 | 20 | 2 | 19 | 7 | 13 | 23 |
| Storage | 0 | 5 | 0 | 6 | 1 | 17 | 2 | 21 |
| Medical | | | | | | | 5 | 0 |
| Research | | | | | | | 2 | 6 |
| Lab | | | | | | | 4 | 9 |
| Shopping Center | 2 | 4 | 1 | 3 | 0 | 1 | - | - |
| Machine Shop | 39 | 201 | - | - | 38 | 318 | 49 | 379 |
| Electrical | 1 | 41 | 1 | 47 | 1 | 54 | 4 | 73 |
| Inspection | | | | | | | 1 | 34 |
| Steel Pipe | | | 2 | 41 | 1 | 69 | 1 | 35 |
| Production Control | | | | | | | 0 | 8 |
| Purchasing | | | | | | | 0 | 2 |

Chart C: Employees By Race Within Each Pay
Group as of August 15, 1971

| Pay Group | No. of Blacks | % of Blacks | % of Total In Plant | No. of Whites | % of Whites | % of Total In Plant |
|---|---|---|---|---|---|---|
| 1 | 34 | (3.68) | (1.35) | 134 | (8.42) | (5.33) |
| 2 | 36 | (3.89) | (1.43) | 22 | (1.37) | (.875) |
| 3 | 336 | (36.31) | (13.36) | 185 | (11.64) | (7.36) |
| 4 | 122 | (13.19) | (4.85) | 44 | (2.76) | (1.75) |
| 5 | 84 | (9.09) | (3.34) | 26 | (1.63) | (1.03) |
| 6 | 125 | (13.51) | (4.96) | 55 | (3.46) | (2.19) |
| 7 | 110 | (11.89) | (4.37) | 55 | (3.46) | (2.19) |
| 8 | 35 | (3.79) | (1.39) | 52 | (3.27) | (2.07) |
| 9 | 23 | (2.49) | (.904) | 278 | (17.49) | (11.06) |
| 10 | 2 | (.216) | (.079) | 49 | (3.07) | (1.95) |
| 11 | 9 | (.971) | (.358) | 104 | (6.67) | (4.13) |
| 12 | 7 | (.757) | (.278) | 436 | (28.43) | (17.38) |
| 13 | 0 | | | 24 | (1.51) | (.959) |
| 14 | 0 | | | 60 | (3.77) | (2.39) |
| 15 | 0 | | | 61 | (3.81) | (2.42) |
| 16 | 0 | | | 1 | | (.039) |
| 17(other) | 2 | (.216) | (.079) | 3 | (.186) | . |
| TOTAL | 925 | | | 1,589 | | |

Between 1965 and 1969, the data indicates less black/white stratification, but the district court found that this was *not* due to advancement by black into previously predominant white employee positions. Rather, as the total black/white hiring figures indicated, the increased hiring of whites and decrease

in the number of blacks led to the placement of whites into the previous lower paying, predominantly black departments and positions. The district court further pointed out that the black employees during this period could not qualify under the testing for transfer or promotion.

Between 1969 and 1971, the statistics demonstrate a rise in the number of black employees in the pay groups 1–8. It was in February, 1968 that the testing requirement for positions in these pay ranges was removed; and in March, 1971 testing for all purposes was halted by the company.

These statistical showings are corroborated by the testimony of Mr. Phelps, the Employment Manager and Administrator of the tests, who stated: [39]

> Q. I said are you familiar with the fact that in taking the tests blacks score less favorably than whites?
>
> A. Yes.
>
> Q. In all departments, is that correct?
>
> A. I can't answer that positively.
>
> Q. What is your best judgment?
>
> A. Yes.

This historical, statistical summary indicates a discriminatory pattern against black employees—(1) assignment to lower paying non-skill departments and (2) assignment to lower paying jobs within all departments. As of August 15, 1971 the traditional predominantly black departments, monocast, fittings foundry, melting, bolt, shipping, steel foundry, and general yards, contained approximately 81% of the black workers of the company.[40] The higher paying, traditionally white departments, maintenance, machine shop, electrical, inspection, and steel pipe, contained only 7% of the black employees although 37.-6% of the total white work force was employed in these departments.

While the extreme stratification by *pay rate* along racial lines of 1963 [41] was blurred by the influx of large number of white employees into the traditionally lower paying black positions from 1965 to 1969, there was no sign of movement of blacks into higher paying jobs.[42] The district court's findings reflect this fact. The district court examined eight key departments to demonstrate that job types were segregated with blacks occupying the lower paying positions. The court concluded:

> The number of all black jobs decreased through 1969 as the number of mixed jobs increased due to the movement of whites into lower paying black jobs. From 1963 through 1969,

39. Every other company official who testified, the Vice-President and Works Manager and the Superintendants of the Pipe Foundry, Machine Shop, and Steel Foundry, agreed that black employees scored less well than white employees.

40. In 1963 when racial stratification was present because of the formal discriminatory policy of the company prior to 1961, these departments also contained 81% of the company's black employees. While this can be somewhat explained by the newly hired blacks between 1969 and 1971, this does not explain the absence of blacks from the higher paying departments and higher paying jobs.

41. In 1963, jobs in all departments were segregated on a racial basis with whites holding only the higher paying jobs and blacks holding only the lower paying jobs. For example, in the mono-cast department, where 359

of 869 black employees work, no black employee earned over $2.65 per hour, while no white employee earned less than $2.65 per hour. In the fittings foundry, only three of the 234 blacks earned above $2.31 per hour while the lowest rate paid to any of the 185 white employees was $2.65 per hour. In the machine shop, every white employee (201 total) earned at least $.41 more than the highest of the thirty-nine blacks. The other departments reflected the same pattern.

42. The comparative earnings charts submitted by appellee to contradict appellants' empirical assertions that black employees were derogated to the lower pay groups suffers from this variable. The newly hired white employees during this period were placed into the lower paying previously black jobs. Since they received low annual salaries, the greater earnings of white employees than black employees of *comparable seniority* was masked.

the number of all white jobs remained approximately constant. Promotion of blacks to the higher paying white jobs, for reasons suggested above [testing and educational requirements], was not being accomplished. The chart drawn up by the court reflects that in 1963 not a single type of job in any of the eight key departments was held by *both* white and black employees; 213 positions were totally segregated.

The data from 1969 indicates that there were fifty-five racially mixed positions and 177 all white or all black positions. But the pertinent indicium for the period 1965–1969 is that the previous *all black* positions were being integrated by the influx of white personnel rather than any upward movement by black employees. In 1965 there were eighty-six all black jobs; in 1969 these were reduced to sixty jobs.[43] A total of thirty-

Chart D: Segregation By Types
Of Jobs

| Department | Year | # All B | # All W | # B/W | Total |
|---|---|---|---|---|---|
| Foundry | 1963 | 38 | 34 | 0 | 72 |
| | 1965 | 37 | 30 | 6 | 73 |
| | 1969 | 18 | 29 | 21 | 68 |
| | 1971 | 19 | 24 | 22 | 65 |
| Melting | 1963 | 20 | 13 | 0 | 33 |
| | 1965 | 11 | 16 | 11 | 38 |
| | 1969 | 9 | 17 | 16 | 42 |
| | 1971 | 6 | 14 | 18 | 38 |
| Steel Foundry | 1963 | 18 | 19 | 0 | 37 |
| | 1965 | 14 | 22 | 4 | 40 |
| | 1969 | 9 | 23 | 11 | 43 |
| | 1971 | 9 | 20 | 12 | 41 |
| Machine Shop | 1963 | 5 | 19 | 0 | 24 |
| | 1965 | – | – | – | – |
| | 1969 | 5 | 11 | 4 | 20 |
| | 1971 | 5 | 26 | 4 | 36 |
| Construction | 1963 | 2 | 9 | 0 | 11 |
| | 1965 | 3 | 11 | 0 | 14 |
| | 1969 | 6 | 15 | 0 | 21 |
| | 1971 | 7 | 21 | 0 | 28 |
| Shipping | 1963 | 6 | 6 | 0 | 12 |
| | 1965 | 9 | 6 | 0 | 15 |
| | 1969 | 7 | 10 | 3 | 20 |
| | 1971 | 8 | 11 | 3 | 22 |
| Personnel | 1963 | 9 | 2 | 0 | 11 |
| | 1965 | 9 | 2 | 0 | 11 |
| | 1969 | 8 | 4 | 0 | 12 |
| | 1971 | – | – | – | – |
| Technical | 1963 | 4 | 0 | 0 | 13 |
| | 1965 | 3 | 10 | 0 | 13 |
| | 1969 | 3 | 3 | 0 | 6 |
| | 1971 | 1 | 1 | 0 | 2 |

43. The machine shop figures were eliminated from this computation because of the missing 1965 data.

four positions were integrated during this period. In other words, twenty-six of the thirty-four jobs were integrated by the movement of *white* employees or applicants into previously *all black* jobs. As late as 1971, only fifty-nine of 232 jobs were integrated—only 25% of the total.

The district court had earlier pointed out that black employees were placed into positions in the lower paid groups:

Although there were and continued to be blacks in substantially all the departments, the overwhelming majority of the black employees historically

Chart E: The Racial Distribution and Salary of Employees
By Department As Of August 12, 1971*

| Department | Avg. Wage In Dept. | Blacks | | | | Whites | | |
|---|---|---|---|---|---|---|---|---|
| | | # | % B. In Dept. | Avg. Wage Of Blacks | Accumulating % Of Blacks In Work Force | # | Avg. Wage Of Whites | Accumulating % Of Whites In Work Force |
| Inspection | $3.83 | 1 | 2.9% | $2.78 | 0.1% | 34 | $3.86 | 2.1% |
| Maintenance | 3.79 | 9 | 8.8 | 3.29 | 1.1 | 93 | 3.84 | 7.8 |
| Machine Shop | 3.65 | 50 | 11.7 | 3.08 | 6.5 | 379 | 3.72 | 31.1 |
| Electrical | 3.63 | 4 | 5.1 | 2.98 | 6.9 | 74 | 3.67 | 35.6 |
| Steel Pipe | 3.63 | 1 | 2.9 | 3.23 | 7.0 | 33 | 3.64 | 37.6 |
| General Stores | 3.57 | 2 | 8.7 | 3.38 | 7.2 | 21 | 3.59 | 38.9 |
| Construction | 3.43 | 27 | 31.8 | 3.01 | 10.1 | 58 | 3.63 | 42.5 |
| General Yards | 3.38 | 19 | 47.5 | 3.22 | 12.2 | 21 | 3.52 | 43.8 |
| Shipping | 3.36 | 30 | 46.9 | 3.06 | 15.5 | 34 | 3.63 | 45.9 |
| Steel Foundry | 3.32 | 36 | 39.6 | 3.16 | 19.4 | 55 | 3.43 | 49.3 |
| Foundry | 3.28 | 247 | 44.7 | 3.03 | 46.2 | 305 | 3.48 | 68.0 |
| Melting | 3.27 | 75 | 39.9 | 3.14 | 54.4 | 113 | 3.35 | 74.9 |
| Monocast | 3.16 | 371 | 54.2 | 3.08 | 94.7 | 314 | 3.26 | 94.2 |
| Bolt | 3.11 | 20 | 34.5 | 2.91 | 96.9 | 38 | 3.22 | 96.5 |
| Personnel, Gen. Plant | 3.04 | 13 | 38.1 | 2.95 | 98.4 | 23 | 3.09 | 97.9 |
| Total | | 905 | | | | 1595 | | |

* All of ACIPCO's departments are included in this chart except those departments having less than 15 employees: Industrial Engineering, Production Control, Medical, Research, Laboratory, Purchasing, Finance and Engineering department. In total, 33 whites and 15 blacks are employed in these departments.

were and continued to be employed in the Pay Group 1–8 jobs in the various departments and particularly in the Mono-Cast 1, 2 and 3, Foundry.

This finding coupled with plaintiff's chart comparing the average wage of blacks and average wage of whites in all the departments firmly establish that black workers were forced into lower paying positions within the company. For example, just in terms of gross comparisons, 95.35% of the black employees and 36.03% of the white employees were in pay groups 1–8, while 63.94% of the white employees and only 4.65% of the black employees were in pay groups 9–16.

The district court, while agreeing that appellants' statistics revealed racial stratification, found that this resulted from factors other than past discriminatory employment practices.[44]

44. The district court stated:
"Understandably, plaintiffs rely heavily upon statistics to support an inference of invidious discrimination. But this is not a voter registration, jury selection, or school desegregation case. Thus the familiar platitude: 'In the problem of racial discrimination, statistics often tell much, and courts listen,' Alabama v. United States, 304 F.2d 583, 586 (5th Cir. 1962), is not an unmitigated evidentiary windfall. In the area of employment, with its complex-

The district court sifted out the following variables which were held to undermine appellants' empirical conclusions that black employees were locked in the lower paying jobs and departments: [45]

(1) Voluntary refusal of training opportunities which are prerequisite to promotion;

(2) Voluntary refusal of promotions;

(3) Lack of requisite qualifications;

(4) The failure to request promotions;

(5) Poor job performances which have defeated promotion or resulted in demotion;

(6) Voluntary transfers to lower job classifications;

(7) Availability or a lack of job vacancies; and

(8) Lack of motivation.

The variables suggested by the district court, when examined in light of our own and the appellants' critical analysis, do not, however, weigh heavily enough to lessen the appellants' empirical conclusions. The district court points to the refusal of 573 black employees to accept promotions from 1965 to 1971. But 554 black employees accepted offered promotions.[46] In addition, the testimony concerning the promotions offered indicated that these positions were often less desirable than the employee's current position, being more physically menial and paying little more

with limited future advancement opportunities. Also, for employees who had substantial seniority, and had consequently reached the top of their pay groups, a promotion involving transfer to a higher paying department would result in a cut in pay and beginning as a new man in the department. *See* United States v. N. L. Industries, *supra,* 479 F. 2d at 362.

For the court to state that the black employees were unqualified is inconsistent with its conclusion that the testing was illegal under *Griggs.* For the testing and seniority were the *only* objective criterion utilized for promotion and transfer. Before January 1, 1971 (the date of the initiation of the posting and bidding procedure), the department superintendents utilized their subjective judgment in determining which qualified (testing and departmental seniority) employees filled job vacancies. We note that these supervisory positions are held by all-white employees.

We considered this type of subjective evaluation in Rowe v. General Motors Corp., supra, 457 F.2d at 359, stating:

All we do today is recognize that promotion/transfer procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foreman are a ready mechanism for discrimination against Blacks. . . . We and others have expressed a skepticism that Black per-

ities and variables, statistics must be analyzed with careful attention both to supportive and opposing facts."
While we reject the district court's conclusion that statistics have a lesser role in employment discrimination cases than these other types of litigation (see note 34, *supra* at 225) we do agree that complexities and variables require close scrutiny of empirical proof. Johnson v. Goodyear Tire & Rubber Co., *supra,* 491 F.2d 1364.

45. ·Specifically in regard to the locking-in issue, the district court declared:
"Black employees cannot be heard to complain that they were locked in a particular job when they were not qualified to per-

form a job in a higher pay group. The record is replete with evidence of black employees who have refused promotions, requested demotions, declined training opportunities, and failed or refused to bid on higher paying jobs, thus voluntarily freezing themselves in the lower paying ones."

46. During this period 854 white employees accepted promotions. There was no information breakdown on how many refused promotions.
Without information on the percentage of white employees refusing promotions and the types of promotions offered white employees, we think the district court's statistic inconclusive.

sons dependent directly on decisive recommendations from Whites can expect non-discriminatory action.

A similar view to the trial court's was put forward by the district court in United States v. Jacksonville Terminal Co., *supra,* 451 F.2d 418, which had rejected the government's statistics because of their failure to evaluate competing black and white employees upon *individual* qualifications and accepted unadorned statements by the employer that they hired or promoted the *best qualified* persons available. We stated:

> The trial judge's pronouncement cannot function as a general rule. It becomes valid only when the employer or union evidentially demonstrates that objective criteria pertinent to the particular job are the determinants of who is "best qualified." *Id.* at 442.

The employee make up of the steel pipe department also belies this conclusion. It is the highest paying primary production department (mono-cast, foundry, steel foundry, melting, and steel pipe) but has very few black workers, one as compared to thirty-five white employees. (See chart B, *supra* at 227). Since there are only a few craft positions in this department, the logical conclusion is that black workers were excluded by discriminatory practices.

The court cites a lack of requests for promotions, and yet, until January 1, 1971 when the formal posting and bidding procedure was initiated, there was no method by which black employees (or any employee) could request promotion.[47] During this period, promotion was, in effect, determined by all white supervisors; a practice we noted in *Rowe* which could have racial emphasis. This is particularly of importance considering the testimony reflecting a number of promotion requests by black employees which were never acted upon by the white foremen and department superintendents. Moreover, we deem appropriate the court's holding in United States v. N. L. Industries, Inc., *supra,* 479 F.2d 354:

> National Lead's contention that the reason black employees were not promoted to supervisory positions was because they did not "ask" to be promoted is without merit. Nothing in the record indicates that white employees were required to make such a request. In any case, a black employee with knowledge of the nominal number of black foremen, the Company's past discriminatory policies, and the current practice of promotion via the recommendation of an incumbent foreman could hardly be expected to make a meaningless request indicating his willingness to be promoted. Sheet Metal Workers [United States v. Sheet Metal Workers], *supra* [8 Cir.], 416 F.2d [123] at 132; *Carter, supra,* 452 F.2d at 331; *see Parham, supra,* 433 F.2d at 427. *Id.* at 369.

Further, there was testimony at trial by a department superintendent[48] that after the passage of the Civil Rights Act of 1964 (Title VII) the company received a

---

47. Courts have condemned procedures for promotion and job assignment which are not objective and uniform. *E. g.,* Brown v. Gaston County Dyeing Machine Corp., *supra,* 457 F.2d 1377; United States v. Dillon Supply Corp., 429 F.2d 800 (4th Cir. 1970).

In *Brown* the court stated:

"Here, in the absence of objective criteria applied to all workers alike, the statistics indicate that race is the only identifiable factor explaining the disparity between the jobs held by white employees and those held by black employees. . . .

"Moreover, the record discloses that noticss of vacancies are not posted, and news of them is passed along by word of mouth. When job classifications are as segregated as they are in this company, delay in learning about a vacancy in an all white category may in itself discriminate against a black employee who hears of it only after it has been filled. This practice resembles the lack of a formal transfer system which we criticized in *Dillon.* 429 F.2d at 802, 804." 457 F.2d at 1383.

48. The superintendent of the mono-cast department gave this testimony. The mono-cast department is the largest of the company's departments with 651 employees. It has always contained the majority of black employees in the plant (currently 40.3%).

"flood" of requests from black employees for more skilled positions. Of course, most were rebuffed by their failure to qualify under the illegal testing. In addition, during the first ten months in which the formal posting and bidding procedure operated, the testing and educational requirements having been terminated for the last six of these months, 41% (107) of the 251 jobs bid for departmentally and plant-wide were won by black employees.[49]

The single foundation for the district court's conclusion that black employees were performing poorly on the job is the figures that from July 5, 1965 through October 1, 1971, seventy-six black employees were demoted. But during the same period 143 white employees were demoted.[50] In addition, the testimony at trial indicates that demotions were often due to work cut backs rather than poor job performance.[51] This demotion statistic concerning black employees is at the least nebulous and at the most negative in support of the court's conclusion.

The only mention in the record of a voluntary transfer to a lower job classification was in reference to physical disabilities which required the employee to request a less physically wearing job. It was stated, however, that the company had a practice of allowing *older* employees, black and white, to accept lower paying, less physically demanding positions without a reduction in pay rate.

As to the unavailability of job vacancies contention, the district court, itself, pointed out that between 1965 and 1970 employment at the company increased by 1,444 jobs, not including turnovers. Advancement opportunities were correspondingly increased during this period of rapid economic development.

The sole ground for the district court's conclusion of lack of motivation on the part of black workers appears to be lack of black enrollment in classes conducted by the company to aid in achieving higher scores in the testing.[52]

Chart F: Class Enrollment By Race

| | White Employees | Black Employees |
|---|---|---|
| 1964 * | 116 | 134 |
| 1965 | 32 | 22 |
| 1966 ** | — | — |
| 1967 | 134 | 12 |
| 1968 | 92 | 19 |
| 1969 | 109 | 10 |

* In 1964 the classes were conducted on a segregated basis.

** The district court did not provide statistics for 1966.

But the statistics for these classes indicate that it was not until 1967 that black enrollment began to fall off. In light of the discriminatory impact of this illegal testing, it may be that blacks simply realized that the testing was stacked against them. This lack of motivation conclusion also comes in the face of the testimony by a company management employee concerning the "flood" of black applicants for more skilled jobs after the passage of Title VII. Further, the intense organization of black employees [53]

49. There are no totals on how many of the 1,854 bidders were black employees.

50. Black employees composed approximately just over one-third of the total employees of the company during this period.

51. The superintendent of the melting department, 118 white employees and 101 black, stated that between July, 1965 and October 1, 1971, twenty-five white and twenty-nine black employees were demoted because of curtailment of operations. Under a departmental seniority system, the employees with the smallest amount of time would be laid off and the employee above him dropped down into his position. These twenty-nine were included in the total number of seventy-six blacks demoted.

52. This conclusion by the district court also conflicts with a finding of initiative on the part of some black employees. The court stated, "Some black employees who failed to score well on the test exercised initiative to take further training with the defendant's assistance, and subsequently improved their test scores and advanced into higher paying jobs."

53. Many of the employees in the class of plaintiffs, here, are members of the Equal Employment Opportunity Committee. This was a committee formed by a majority of

and continued interest in this and past litigation [54] demonstrates that the black employees of the company are interested in opportunities for better pay and more highly skilled jobs.

In brief, the district court held that the statistical demonstration of the derogation of black employees to lower paying jobs and departments resulted from black employees' refusal of promotion and training opportunities, lack of qualifications, failure to request promotions, poor job performance, transfer to lower pay groups, lack of job vacancies, and lack of motivation. We find that this holding was "clearly erroneous." Humphrey v. Southwestern Portland Cement Co., 5 Cir., 488 F.2d 691 [1974]. Not only are these variable too numerally diminutive to rebut the distinct disparity in the black/white employment data,[55] but analysis and the evidence have disclosed that these variables have no substantial validity.[56]

3. *Conclusion concerning the promotion procedure.* The statistical picture drawn here is similar to that which this Court found persuasive in United States v. Jacksonville Terminal, *supra,* 451 F.2d 418. Under attack by the government there was a promotion system with a bidding procedure based on a rigid craft or class seniority similar to the bidding and departmental seniority systems at issue here.[57]

This Court stated:

. . . [T]hey [statistics] do prove that employment at the facility is approximately equally divided between whites and blacks, that whites generally occupy the higher paying positions, and that blacks hold the lower paying jobs. *Id.* at 441.

black employees of the company in 1965. And 718 charges from class members have been filed with the Equal Employment Opportunity Commission.

54. This is the third time in five years that the plaintiffs have been before us.

55. *Cf.* Ochoa v. Monsanto Company, *supra,* 473 F.2d at 320 ("But the smallness of the numbers demonstrates that the Court was not compelled to allow such statistical showing to set in train the usual presumptions or to make a finding of preference thereon.").

56. In reviewing the trial court's determination, we are bound by the standard of Rule 52(a) of the Federal Rules of Civil Procedure: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Although Judge Learned Hand was correct in stating, "It is idle to try to define the meaning of the phrase 'clearly erroneous,'" (United States v. Aluminum Co., 148 F.2d 416, 433 (2d Cir. 1945)) this Court aptly phrased a workable formula in Chaney v. City of Galveston, 368 F.2d 774 (5th Cir. 1966):

". . . A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. . . . It is well settled that in order for a reviewing court to set aside findings of fact by a trial court sitting without a jury, it must be clearly demonstrated that such findings are without adequate evidentiary support in the record, or were induced by an erroneous view of the law, and the burden of showing that the findings are clearly erroneous is on the one attacking them." *Id.* at 776.

*See* United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Baggett v. Richardson, 473 F.2d 863, 865 (5th Cir. 1973); Hodgson v. American Bank of Commerce, 447 F.2d 416, 419 (5th Cir. 1971). *See generally,* 5A Moore's Federal Practice ¶ 52.03 [1] (2d Ed. 1969).

The findings reviewed here do not involve conclusions based on the credibility of witnesses giving conflicting testimony. Dillon v. M. S. Oriental Inventor, 426 F.2d 977 (5th Cir.), cert. denied, 400 U.S. 903, 91 S. Ct. 140, 27 L.Ed.2d 140 (1970). Rather at issue is the weight of evidence supporting the trial court's findings. We have determined that these findings are "without adequate evidentiary support" and therefore are "left with a definite and firm conviction" that the district court was mistaken.

57. The Terminal maintained thirty-five seniority craft rosters. Within each roster jobs were broken down into classes which differed in pay and function. Ordinarily collective bargaining agreements precluded use of seniority acquired on one roster to bid for a job vacancy on another roster. In some cases, the same was true for interclass transfers. Vacancies were posted within the particular craft or class, and craft seniority primarily determined the winning bidder. *Id.* at 427.

Similarly, the work force here is approximately 50% black with the black employees occupying the lower paying jobs and departments. Likewise, the jobs and departments here and in *Jacksonville Terminal* have been segregated both by prior formal discrimination and present effect.

> The statistics also show that almost all Terminal jobs were held exclusively either by whites or by blacks before July 2, 1965, and that this division has continued, with few exceptions, after that date. . . . Terminal records disclosed that the persistence of "black" and "white" jobs—whatever their formal denotation—has not been caused by failure to hire new personnel. . . . Moreover, as noted earlier, all blacks hired during this period, have become Porters. Promotions too have occurred. Blacks have gained a few supervisory positions in the Baggage and Mail Department and two Helper jobs in other departments. "In racial discrimination cases, statistics often demonstrate more than the testimony of many witnesses, and they should be given proper effect by the courts." Jones v. Lee Way Motor Freight, Inc., *supra,* 431 F.2d at 247; *accord,* Bing v. Roadway Express, Inc., 5 Cir. 1971, 444 F.2d 687 [1971]; Lea v. Cone Mills Corp., M.D.N.C.1969, 301 F.Supp. 97, 102 *aff'd.,* 4 Cir. 1971, 438 F.2d 86. *Id.* at 442.

The district court there also rejected the statistical showing, finding that the employer had simply "hired or promoted the best qualified persons available for the particular jobs." This Court reversed:

> We cannot accept the assumption that the Government's statistics have no probative force: *i. e.,* "[t]he Government's failure or refusal to undertake a comparative evaluation of the entitlement to job vacancies of competing Negroes and whites, upon the basis of individual qualifications, leaves the record without probative evidence to support [the contention that black employees were not even considered for jobs to which whites were promoted or for which they were hired]." 316 F.Supp. at 581. The trial judge's pronouncement cannot function as a general rule. It becomes valid only when the employer or union evidentially demonstrates that objective criteria pertinent to the particular job or the determinants of who is "best qualified." *Id.* at 442.

This Court then went on to strike down the craft and seniority system because it restricted the "transfer and promotion opportunities of incumbent black employees." *Id.* at 453.

We have condemned similar promotion systems based on *job* seniority which operated to perpetuate past discrimination in Johnson v. Goodyear Tire &. Rubber Co., *supra,* 491 F.2d at 1373–1374; United States v. Georgia Power Co., *supra,* 474 F.2d 906; Long v. Georgia Kraft Co., *supra,* 450 F.2d 557; Local 189, United Papermakers & Paperworkers v. United States, *supra,* 416 F.2d 980. Likewise, other courts have found tainted departmental or job-type seniority systems, utilized for promotion purposes, which effectuated discrimination. United States v. N. L. Industries, Inc., *supra,* 479 F.2d at 358–360; United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971); Robinson v. Lorillard Corp., *supra,* 444 F.2d at 795–800; Griggs v. Duke Power Co., 420 F.2d 1225, 1236–1237 (4th Cir. 1970), rev'd on other grounds, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); United States v. Virginia Electric and Power Company, *supra,* 327 F.Supp. 1037; Clark v. American Marine Corp., 304 F.Supp. 603 (E. D.La.1969).

■ The appellants have made a strong showing (1) that the company had a formal policy of discrimination prior to 1961 which lingered until 1963; (2) that the company maintained illegal testing and educational requirements from 1964 to 1971; and (3) that the employment statistics from 1963 until

1971 reflect that black employees have been derogated to the lower paying, non-skill departments and to the lower paying positions in all departments because of these past discriminatory employment practices. As we demonstrated above these variables cited by the trial court to explain the statistics, do not, on analysis, undermine the large statistical disparity between black/white employees' departments, positions, and pay rate. We have observed that the departmental seniority system deters black employees, by their loss of seniority and pay rate, from transferring and that the posting and bidding procedure, requiring initial consideration of persons within the department, often may prevent even the application of the majority of black employees for a job vacancy in the higher paying, predominantly white departments. In addition, both practices operate to handicap black employees in intradepartmental promotion because past discrimination was an impediment to black employees acquisition of seniority in these departments. Therefore, the neutral practices of the departmental seniority system and the posting and bidding procedure carry forward into the present the stratification of black employees into lower paying, non-skill departments and jobs resulting from past discrimination. Neutral employment practices perpetuating past discrimination were condemned by the Supreme Court in Griggs v. Duke Power Co., 401 U.S. at 430. Affirmative relief is mandated by our decisions in Johnson v. Goodyear Tire & Rubber Co., *supra,* 491 F.2d at 1371, n. 34; United States v. Georgia Power Co., *supra,* 474 F.2d at

927; and Local 189, United Papermakers & Paperworkers v. United States, *supra,* 416 F.2d at 990–991.[58]

### B. *Apprentice Program and On-The-Job Training*

The company provides its employees an opportunity to train for the highly skilled, higher paying craft jobs through an apprentice program or on-the-job training (journeymen). The company maintains these programs for the following crafts: mechanic, machinist, electrician, carpenter, molder, pattern maker, welder, scale mechanic, brick layer, plumber, and tinsmith. The departments in which most of the craft jobs are located are the machine shop, electrical department, construction department, and maintenance department.

1. *Apprenticeship.* Only incumbent employees are eligible for the apprentice program. Applicants are required to have the following qualifications: (1) a high school education or its equivalent, (2) employment in the same department and/or trade for a minimum of six months, (3) prior to March 31, 1971, achievement of the fiftieth percentile on the California Test of Mental Maturity and a passing score on all aptitude tests for the particular skill or craft, (4) under twenty-six years of age or under thirty years of age for those applicants having served in the military. Once selected for an apprenticeship, the trainee has to complete an 8,000 hour course, approximately three and one-half to four years. During this time, the employee receives a starting salary at a pay rate 3, but works up to the higher rate of 11. After finishing the apprenticeship and

---

58. "Full enjoyment of Title VII rights sometimes requires that the court remedy the present effects of past discrimination. *See* Louisiana v. United States, 380 U.S. 145, 154, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965). This includes both redressing the continuing effects of discriminatory seniority systems, Local 189, United Paperworkers v. United States, 416 F.2d 980 (5th Cir. 1969) ; United States v. Jacksonville Terminal Co., *supra*; United States v. Hayes International Corp., *supra* [5 Cir., 456 F.2d 112], and affirmative action to alter a seniority system which is not discriminatory on its face. If the present seniority system in fact operates to lock in the effects of past discrimination, it is subject to judicial alteration under Title VII. Local 53, International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047, 1052 (5th Cir. 1969) ; Local 189, *supra,* at 991 of 416 F.2d." 474 F.2d at 927.

after being placed into a craft position, the employee is eligible for a pay rate 12 or 13.

Appellants assert (1) that the continued high school education or its equivalent requirement constitutes a *present* discriminatory practice and (2) that the past intentional exclusion of black employees from craft jobs and the illegal testing has a continuing adverse impact under current neutral practices. Concerning the apprentice program, the district court declared: "Defendant has practiced no invidious racial discrimination in the administration of its apprenticeship and journeyman programs." We reverse this finding as "clearly erroneous." [59]

■ We agree with appellants that the educational requirement is not neutral. This standard, itself, is a *present* discriminatory practice if it has a disproportionate impact on black applicants. Griggs v. Duke Power Co., *supra*; United States v. Georgia Power Co., *supra*, 474 F.2d at 918–919; United States v. Inspirational Consolidated Copper Co., *supra*, 6 EPD ¶ 8918.

■ From 1915 until the time of the trial, only one black employee had ever participated in the apprentice program, while 208 white employees have done so. Moreover, from 1915 until 1961, the total exclusion of black employees from craft jobs was a culpable company policy. We have previously discussed the district court's finding that the large majority of black employees have historically and continue to be within the lowest pay groups, 1–8. This educational criterion must continue to have an adverse impact on black employees because 56% do not have a high school diploma.[60] Because of this disproportionate impact, the burden shifts to the company to demonstrate that their high school ed-

ucation or equivalent requirement for entry into the apprentice program is "job related." Griggs v. Duke Power Co., *supra*; United States v. Georgia Power Co., *supra*; United States v. Inspirational Consolidated Copper, *supra*.[61]

The company's response was that their educational standard was not a high school diploma or its equivalent, rather a criterion used to select applicants who had obtained a sufficient educational level to successfully complete the International Correspondence courses relating to the craft for which they were entering an apprenticeship. The district court's finding that a high school education or its equivalent was a prerequisite for the apprentice program rebuts this assertion. Moreover, the company's own policy statement defining their apprentice program states as a qualification—"high school graduate or equivalent." We do, however, construe this argument as both an attempt to show "job relatedness" and "business necessity." [62]

■ In order to show job relatedness, *Griggs* stated that a requirement must "bear a demonstrable relationship to successful performance of the jobs for which it was used." 401 U.S. at 431. Here, we understand the company to mean that a certain reading level and familiarity with study techniques is necessary to participate in the course work of the apprentice program. This cannot be *equated* with a requirement for a high school education or its equivalent. This Court, in fact, affirmed a district court's condemnation of a similar rationale for a high school educational criterion in *Georgia Power:*

The justification offered at trial for the requirement was very weak. As the district court observed:

"At best, the only justification for this requirement is the obvious even-

---

59. See note 56, *supra* at 234.

60. Of the white employees, 12% do not have a high school diploma.

61. Under the EEOC guidelines, 29 C.F.R. § 1607.2, an educational requirement is defined as a test. The company made no attempt to validate this requirement under these guidelines which we mandated in *Georgia Power*, *supra*, 474 F.2d at 913.

62. We will postpone our analysis of business necessity until III(A), dealing with the required remedial changes in the apprentice program.

tual need for above-average ability to read and comprehend the increasingly technical maintenance manuals, the training bulletins, operating instructions, forms and the like demanded by the sophisticated industry. . . . In such a context, the high school education requirement cannot be said to be reasonably related to job performance. This is not to say that such requirements are not desirable . . . it simply means that the 'diploma test' cannot be used to measure the qualities. Many high school courses needed for a diploma (history, literature, physical education, etc.) are not necessary for these abilities. A new reading and comprehension test . . . might legitimately be used for this job need." 474 F.2d at 918.

Here just as in *Georgia Power,* there are employees who have had substantial job success and advancement without a high school education.[63] For example, there are seventy-five white employees,[64] without a high school education, receiving over $4.00 an hour. Of the approximate fifty foremen and forty to fifty leadmen in the plant, twelve foremen and eight leadmen are among this seventy-five. Sixteen of this group are machinists in the machine shop, a highly skilled, craft department; and two are

electricians. The high proficiency level established by this standard not only precludes qualified employees but also is not refined sufficiently to measure the ability sought by the company. As the Supreme Court promulgated in *Griggs* and this Court stated in *Georgia Power,* "the use of a high school requirement which has a disproportionate racial impact and has not been proven to be a predictor of ultimate job success controverts the congressional mandate of Title VII." [65] 474 F.2d at 918.

■ Assuming past discrimination has illegally denied present employees training opportunities, the question becomes: do present neutral prerequisites for entry into and completion of the apprentice program continue to deny these injured employees rightful benefits. The neutral prerequisites challenged by appellants are the *age* requirement and the *length* of the apprenticeship.[66] Appellants argue that the application of the age requirement has the consequence of continuing to exclude from the apprentice program all black employees who are employed and reached the age of twenty-five or twenty-nine before the company ceased its official segregation in 1961. Additionally excluded are those blacks barred by the testing program,

63. In *Georgia Power* we observed:
"Many employees without high school diplomas have mastered the technical literature and many of the highest-ranking personnel in the company did not pass the 'diploma test,' including 47 of 100 foremen, supervisors, and chief division operators in the Atlanta and Macon operating division." 474 F.2d at 918–919.

64. There is only one black employee in the whole plant whose pay rate exceeds $4.00 an hour.

65. The question whether the educational criterion operated, independently with the testing, to produce this disparity can be answered in the affirmative. The inferences on this issue are unlike the question of the consequences, independent of the testing, of the subjective discretion of the white department superintendents who did all the selecting of supervisory personnel *infra.* The fact that

this criterion is objective and acts automatically to eliminate non-high school graduates, coupled with the large percentage of blacks without a high school education and the implication that white employees without high school educations have advanced into responsible and skilled positions in all departments, are sufficient to refute this objection.

66. Appellants also challenge the six month prerequisite service within the craft department. They argue that because of the long exclusion of black employees from craft departments, this selection criterion perpetuates past discrimination. We agree with this conclusion. However, the record and finding of fact by the district court reflect that employees are *selected* from throughout the plant and *then* evaluated for six months on the job within a craft department; rather than being selected only from employees within the craft department.

who reached the age of twenty-five or twenty-nine before the company ceased its testing program in 1971. Therefore, appellants conclude that this age requirement perpetuates into the present effects of past discrimination and is unlawful.[67]

Appellants deduce that the impact of past discriminatory practices in the apprentice program is blatant from the historical and statistical showing, recited above. In addition, appellants point to the *testimony* by company officials, stating that the effect of the tests and educational requirement was to screen out blacks from the apprentice program. The historical formal exclusion and the statistical and testimonial evidence demonstrating disproportionate exclusion of blacks by the testing and educational requirements, when combined with the continuing use of the high school education or its equivalent standard and the present age requirement and lengthy apprenticeship term, constitutes not merely a *prima facie* case, but *conclusive* proof[68] of present effect from past discrimination.[69]

2. *On-the-job training.* Prior to March, 1971, to qualify for on-the-job training for journeyman status in a craft position, an applicant had to (1) meet the specified testing requirements, the same mental maturity test and aptitude test required for the apprentice program, (2) have three year's experience in a craft department or related craft job, and (3) be selected by the (all-white) supervisory employee group for the program. The company currently relies on a bid system for entry into the on-the-job training program. Under this procedure bids are taken within the craft department and the *senior* qualified man is selected. Only if no bids from qualified men are received from within the departments are employees from outside the department allowed to compete. In either case the final selection is determined by the all-white supervisory group. After the trainee has had six years' experience and if his departmental superintendent recommends him to the apprentice committee, the trainee is eligible for the intermediate craft salary rate. After an additional year's experience, the trainee is eligible for the craft rate (pay group 12 or 13).

Appellants argue that the present bidding system and the length of the training program lock in black employees derogated to lower paying, unskilled jobs by past discrimination. The district court, as quoted above, held that the defendant had not violated Title VII or section 1981 in administering its journeyman program. We reverse this holding as "clearly erroneous."[70]

We accepted, *supra* II(A), the court's and appellants' statistical conclusion that black employees had been restricted to jobs in non-craft departments and in the 1–8 pay groups containing no craft or craft related positions, first by the formal exclusion prior to 1961 and then by the testing requirement from 1964 until 1971. To focus even further on this finding, appellants cite the employment data for pay groups 12 and 13, encompassing craft and technical positions. This data compiled two months before trial indicated only seven blacks, .76% of black employees, had reached pay group 12; *none* had obtained a group 13

---

67. See note 33 and accompanying text, *supra* at 224.

68. That a holding of conclusive proof is warranted, we cite our statement in United States v. Jacksonville Terminal Co., *supra*, 451 F.2d at 442:

"Absent explanatory evidence and testimony, the statistics indicate that officials have impliedly equated job qualification with race. *See id.* [United States v. Sheet Metal Workers Local 36, *supra*, 416 F.2d]

at 127; Lea v. Cone Mills Corp., M.D.N.C.1969, 301 F.2d 97, 102. In a Title VII case, such implications are important. *When combined with other evidence and testimony, they may be conclusive.*" (Emphasis added).

69. See note 34, for the proposition that some courts have held that statistics *alone* may demonstrate conclusive proof of discrimination.

70. See note 56, *supra* at 234.

position. At this time, 436 white employees, 28.4% of the total, occupied group 12 jobs, and twenty-four, 1.5% of the total, held group 13 jobs. An additional factor relied on by appellants is the selection on the subjective evaluation by the all-white supervisory force, both a past and a present prerequisite to entry into the training program. Rowe v. General Motors Corp., *supra*, 457 F.2d at 359 ("we and others have expressed a skepticism that Black persons dependent directly on decisive recommendations from Whites can expect non-discriminatory action.")[71]

The intentional discrimination by the company from 1915 until 1961 totally excluded black employees from the on-the-job training program. From 1964 until 1971, the testing continued to restrict black employees from craft departments and from craft jobs and craft related positions. We also recognize the discriminatory potential of subjective evaluation of blacks by the all-white supervisory groups.[72] Therefore, we are compelled again to find that past discrimination has had an adverse impact upon black employees' employment opportunities which is carried forward by neutral, current practices. The bidding procedure presently in effect would require black employees long denied this training opportunity in the past, to suffer a loss of seniority and cut in salary for admittance and participation in this training program. The requirement that bids from *within* the craft departments be given initial, primary consideration must fail in light of the proof demonstrating that a large majority of black employees have been excluded from these departments. In addition, a lengthy training program of six years

will continue to exclude black employees from craft positions for an unnecessarily longer period. Appellants have presented *prima facie* evidence of the present effect of past discrimination, thus requiring affirmative relief.[73] Cf. McDonnell Douglas Corp. v. Green, *supra*, 411 U.S. at 800–807.

### C. Supervisory Positions

■ The appellants question the absence of black employees from the supervisory positions of leadmen and foremen. The district court made the following finding of fact concerning this absence:

> Out of approximately fifty leadmen, only three have been black. Defendant has never had a black foreman.

However, the court drew no specific conclusion of law on the issue of discrimination, other than a general recital at the end of its opinion[74] that the plaintiffs were not entitled to any other relief.

The leadman is the worker who sets the pace for his unit of workers. The general practice is to choose the foreman from the ranks of the leadmen. Prior to March, 1971, there were two qualifications for the positions of leadmen and foremen. First, the candidate had to have obtained the requisite testing achievement. Secondly, the department superintendents, who have always been white, then selected the "best qualified" of these individuals. This selection was based on their subjective judgment rather than objective criteria. The testimony at trial indicated that there were approximately forty to fifty leadmen, of which one was black. Of the approximate fifty foremen none were black.

The statistical disparity presented in this case combined with the illegal test-

---

71. Appellants do not challenge this subjective judgment by all-white supervisory group as an independent, present discriminatory practice. Rather it is a factor used to bolster their conclusion as to the impact of neutral practices resulting from past discrimination.

72. For a detailed discussion of the use of subjective criteria in judgment, see text and accompanying footnotes *infra* at 240–242.

73. See note 58, *supra* at 236.

74. The statistical finding by the district court of three black employees as leadmen is an overstatement as the record and the briefs on appeal of *all* parties indicate that only one black employee has been advanced into a supervisory position as a leadman.

ing and a subjective standard applied by all-white department supervisors would normally present a conclusive showing of *present* discrimination. The company, however, terminated their testing requirement for these positions in March, 1971, which was six months prior to the trial in October, 1971. The question for us is whether selection on the basis of subjective judgment of all-white superintendents operates *independently* of the testing to discriminate and helped produce this disparity.

In Rowe v. General Motors Corp., *supra,* 457 F.2d 340, this Court admonished an employer for allowing possible discriminatory subjective evaluation by all-white supervisors in the promotion of black employees. This Court cautioned:

> . . . [H]ad to acknowledge that the methods for promotion/transfer at *GMAD* would enable an individual foreman, if he were so inclined, to exercise racial discrimination in his selection of candidates for promotion/transfer, and that, under the social structure of the times and place, Blacks may very well have been hindered in obtaining recommendations from their foremen since there is no familial or social association between these two groups. All we do today is recognize that promotion/transfer procedures which de-

pend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foreman are a ready mechanism for discrimination against Blacks much of which can be covertly concealed and, for that matter, not really known to management. We and others have expressed a skepticism that Black persons dependent directly on decisive recommendations from Whites can expect non-discriminatory action. 457 F.2d at 359.

In the past, this Court has ordered the development of objective criteria in order to eliminate the possible discrimination inherent within subjective employment determinations.[75] Local 53 of the International Association of Heat and Frost Insulators and Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969). In cases involving similarly alleged racial discrimination for promotions to supervisory positions, courts have acted on a showing equal to that made by the appellants here.[76] In United States v. N. L. Industries, *supra,* 479 F.2d 354, the court stated:

> The inference of discrimination provided by the statistics is reinforced by the Company's method of selecting foremen. The Company's promotional plan is very similar to that used by General Motors Corporation in *Rowe,*

---

75. *See* Brown v. Gaston County Dyeing Machine Co., *supra,* 457 F.2d at 1382–1383 ("Elusive, purely subjective standards must give way to objectivity if statistical indicia of discrimination are to be refuted."); United States v. Bethlehem Steel Corp., *supra,* 446 F.2d at 655.

Subjective discretion by all-white supervisory personnel is comparable to that found suspicious in jury discrimination suits. In Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), the Supreme Court concluded:

"In sum, the appellants demonstrated a substantial disparity between the percentages of Negro residents in the county as a whole and of Negroes on the newly constituted jury list. They further demonstrated that the disparity originated, at least in past, at the one point in the selection process where jury commissioners invoked their *subjective judgment* rather than

objective criteria. The appellants thereby made out a prima facie case of jury discrimination, and the burden fell on the appellees to overcome it." *Id.* at 360.

This Court had earlier found jury commissioners' subjective judgment failing in Pullum v. Greene, 396 F.2d 251, 257 (5th Cir. 1968). *See generally,* Jury Discrimination In the South: A Remedy?, 8 Colum.J. of L.Soc.Prob. 589 (1972).

76. In addition to the cases discussed herein, see Stamps v. Detroit Edison Co., *supra,* 365 F.Supp. at 112–113; Young v. Edgcomb Steel Co., 363 F.Supp. 961, 969–970, 971 (M.D.N.C.1973). The Equal Employment Opportunity Commission has entered findings of discrimination in promotion to supervisory positions where a highly subjective promotion system has had a disproportional impact on minority group employees. CCH EEOC Decisions ¶ 6252, ¶ 6228 (1973).

*supra,* 457 F.2d 348. In that plan the foreman's recommendation was the indispensable, single most important element in the promotional process; there were no written instructions to foremen as to the qualifications desired; standards that were set were vague and subjective; hourly employees were not notified of promotional opportunities; and there were no safeguards in the procedure to prevent discrimination.

\* \* \* \* \* \*

We think evidence indicating that out of about 100 foremen only three are black, that these three black foremen are in charge of only Labor department employees, that a black foreman has never been in charge of white employees in this bargaining unit, that one of thirty-six employees promoted to foreman since 1965 was black, that a pool of qualified black employees exist, and that white employees with less qualifications have been promoted to foreman positions presents a prima facie case of racial discrimination that has not been rebutted by the Company.

*Id.* at 368.

And in Russell v. American Tobacco Co., *supra,* 5 EPD ¶ 8447, the court pointed to the holdings of Brown v. Gaston County Dyeing Machine Company, *supra,* 457 F.2d 1377, and Rowe v. General Motors Corp., *supra,* 457 F.2d 348, condemning the lack of objective criteria in the face of a statistical disparity in job promotion as discrimination. The court then concluded:

In the instant case, the figures from the Leaf operation can hardly be surpassed. Of 63 white employees in Leaf (60 regular, 3 seasonal), 27 are foremen. Only 23 regular white employees are not supervisors. Therefore, 45 per cent of all regular whites are supervisors. In considering the same figures for blacks, there are 3 supervisors (76 regular, 124 seasonal). Out of 76 blacks, 3 are supervisors. Even figuring it out to one decimal point, only 3.9 per cent of the regular blacks are supervisors. There figures would chafed the conscience of this Court, even if objective criteria were fully in use, which has not been demonstrated. This lack of objective guidelines and written criteria are some indicia of discrimination. 5 EPD ¶ 8447 at 7191–92.

The record reveals evidence of at least two black employees who, prior to March, 1971, had the requisite qualifications for leadmen or foremen but had been denied promotion.[77] In addition, the record reflects that while many whites had been appointed as "relief leadmen,"[78] no black employees have had such an opportunity. Testimony by two department supervisors, however, indicated that since the testing qualification was dropped, black employees in these departments, steel foundry and mono-cast, are qualified and are under consideration for these supervisory positions. We are uncertain whether the consideration of black employees since the testing was terminated, stems from

---

77. Booker T. Powell had made the highest possible score on the qualifying test, had a high school and one and one-half years college education, had worked for the company since 1954, and had extensive experience in many of the jobs in the cleaning shed (the mono-cast department). Moreover, he had even requested consideration for a leadman position.

Further testimony also implied that Willie Dunn was qualified. He had obtained the prerequisite scores, had taught at the company's night school, had attended metallurgy courses on off hours, and was deemed quali-

fied by company officials. Evidently, although the record is confusing on this point, pressure from both white employees and supervisors and black employees, concerning his upgrading, caused a mental breakdown. He is now on medical pension.

78. While there is no formal training for these supervisory positions, testimony demonstrates that, at least in the mono-cast department, temporary vacancies occur because of vacation, sickness, business and other reasons every week. "Relief" leadmen are appointed from those under consideration for permanent promotion to these positions.

awareness, stimulated by this and other law suits, by the company of possible legal sanctions, or whether the illegal testing alone had created this discriminatory barrier, and now qualified black employees are being considered. Therefore, we are remanding this issue, the independent effect of subjective evaluation by all-white superintendents, to the district court.[79]

On remand, we point out three indicia, among others, which the district court should examine. First, as to whether there are more examples of black employees who were able to hurdle the illegal testing barriers to these supervisory positions, but then were disqualified under the subjective criteria utilized by the department superintendents.[80] Secondly, the court should note whether less qualified white employees have been appointed leadmen or foremen both prior

to March, 1971 and since that time. Finally, the court should obtain evidence of the operation of this subjective standard applied by white supervisors since the trial.[81]

## III. RELIEF

In fashioning an appropriate remedy for employment discrimination, Congress has granted courts plenary equitable power under both Title VII, 42 U.S.C.A. § 2000e–5(g) (Supp.1973),[82] and section 1981.[83] Most courts, and expecially our Circuit, have applied this equitable relief within the framework of the "rightful place" theory.[84] In Georgia Power, this Court explained: "Most courts, in molding appropriate remedies, have adhered to the 'rightful place' theory, according to which blacks are assured the first opportunity to move into the next

---

79. By remanding, we do not mean to close off any back pay award for a black employee, like Booker T. Powell, who might be able to put forward a back pay claim for a supervisory position.

80. We note that because of the nature of these supervisory positions there is a slow turnover. Consequently, only a few cases of discretionary passover may constitute sufficient proof considering the statistical disparity already existing.

81. The district court should make specific findings on the assertion in appellee's brief, stating:

"While outside the record, the Company feels it appropriate to advise the Court that currently the Company has two black foremen and five black leadmen."

Appellee's Response to the Brief of United States Equal Employment Opportunity Commission as Amicus Curiae at 8.

82. This provision states, in part:

"(g) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful em-

ployment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission."

*See* Local 189, Papermakers & Paperworkers v. United States, *supra*, 416 F.2d at 996–997.

This Court has always recognized the importance of granting full relief in Title VII cases. *E. g.*, United States v. Georgia Power Co., *supra*, 474 F.2d at 927; Vogler v. McCarty, 451 F.2d 1236, 1238–1239 (5th Cir. 1971).

83. *See* Boudreaux v. Baton Rouge Marine Contracting Company, 437 F.2d 1011 (5th Cir. 1971); Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970), cert. denied, 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971); Lazard v. Boeing Company, 322 F.Supp. 343, 345–346 (E.D.La.1971); Tolbert v. Western Electric, 56 F.R.D. 108, 115–116 (N.D.Ga.1972).

84. This theory of relief for employment discrimination was explicated in Note, Title VII, Seniority Discrimination and the Incumbent Negro, 80 Harv.L.Rev. 1260 (1967), first applied by our Circuit in United States v. Local 189, United Papermakers & Paperworkers, 301 F.Supp. 906 (E.D.La.1969), aff'd., 416 F.2d at 988, and recently endorsed in Bing v. Roadway Express, Inc., *supra*, 485 F.2d at 450–451; and United States v. Georgia Power Co., *supra*, 474 F.2d at 926–927.

vacancies in positions which they would have *occupied* but for wrongful discrimination and which they are qualified to fill. Note, Title VII, Seniority Discrimination and the Incumbent Negro, 80 Harv.L.Rev. 1260, 1268 n. 2 (1967)." 474 F.2d at 927. We agree that: "This is the theory which should be applied here." *Id.*

Before moving to the necessary corrective measures, there is need to define the class of employees to whom these remedies are applicable. The district court, before trial, approved this suit as a class action within Rule 23(b)(2).[85] This class includes black employees, both named and unnamed, who have filed or not filed complaints with the Equal Employment Opportunity Commission. Caldwell v. National Brewing Co., 443 F.2d 1044 (5th Cir. 1971), cert. denied, 405 U.S. 916, 92 S. Ct. 931, 30 L.Ed.2d 785 (1972) (section 1981); Jenkins v. United Gas Corporation, 400 F.2d 28 (5th Cir. 1968) (Title VII); Oatis v. Crown Zellerbach Corp., 398 F.2d 496 (5th Cir. 1968) (Title VII). Specifically, this class is composed of black employees of the company employed prior to March 8, 1971, termination date of the testing and educational requirements for pay groups 9–16, and also embraces those black employees hired after March 8, 1971 harmed by *present* discriminatory practices.

### A. Enjoining the Testing and Educational Requirements

The district court recognized that the testing and educational criteria had a detrimental impact on black applicants and employees as a class. An injunction against the resumption of such practices was denied because the company had eliminated the educational hiring requirement and all testing in March, 1971. We find no abuse of discretion in the district court's refusal to grant such an injunction. *Cf.* Parham v. Southwestern Bell Telephone Co., *supra,* 433 F.2d at 429–430.

However, the high school educational criterion for admittance to the apprentice program remains in use. It was earlier held violative of Title VII and section 1981.[86] At that point we reserved the discussion of the "business necessity" justification. This doctrine has evolved to except those few employment practices, which are *non-intentionally* discriminatory or neutral, but perpetuate the consequences of past discrimination, because of their overriding business necessity.[87] *See* Griggs v. Duke Power Co., *supra,* 401 U.S. at 431–432; United States v. N. L. Industries, *supra,* 479 F.2d at 364–366; Robinson v. Lorillard Corp., *supra,* 444 F.2d at 797–798. Once a discriminatory result is demonstrated, the defendant has the burden to justify a practice under a "business necessity."[88] The nature and

---

85. See note 4 and accompanying text, *supra* at 217.

86. *See* II(C)(1), *supra.* The appellants are not challenging job-relatedness of the course work required by the apprentice program, only the high school educational or equivalent requirement. *See* Buckner v. Goodyear Tire and Rubber Co., 339 F.Supp. 1108, 1122–1125 (N.D.Ala.1972).

87. In United States v. St. Louis-San Francisco Railway Co., *supra,* 464 F.2d 301, the Eighth Circuit Court of Appeals, en banc, explained:
"However, this doctrine of business necessity which has arisen as an exception to the amenability of discriminatory practices, 'connotes an irresistible demand.' The system in question must not only *fos-*ter safety and efficiency, but must be *essential* to that goal. United States v. Bethlehem Steel Corp., 446 F.2d 652, 662 (2d Cir. 1971); United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972). In other words, there must be no acceptable alternative that will accomplish that goal 'equally well with a lesser differential racial impact.' Robinson v. Lorillard Corp., 444 F.2d 791, 798 (4th Cir.), cert. dismissed, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); *accord* United States v. Bethlehem Steel Corp., *supra,* 446 F.2d at 662." *Id.* at 308.

88. Rowe v. G. M. C., *supra,* 457 F.2d at 355 n. 14; United States v. Jacksonville Termi-

requirements of this burden were correctly outlined in Robinson v. Lorillard Corp., *supra,* 444 F.2d at 798 :[89]

> Collectively these cases conclusively establish that the applicable test is not merely whether there exists a business purpose for adhering to a challenged practice. The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with lesser differential racial impact.

As our holding *supra* makes clear, a high school diploma or equivalent criterion does not effectively measure the reading and study skills necessary for the course work required by the apprenticeship. There are also alternative methods, such as a validated reading test suggested by the district court in *Georgia Power,*[90] which would have a lesser racial impact. Moreover, since there is a large demonstration of successful employee achievement without a high school diploma, a discriminatory standard, by definition, cannot be a "business necessity." We, therefore, conclude that the district court should enjoin the continued use of a high school educational requirement for entrance into the apprentice program.

## B. Restructuring and Promotion Procedures

**1. Business necessity.** The company argues "business necessity" to justify the continued use of its promotion practices—seniority and the posting and bidding procedures. The company insists that its jobs are functionally related, so that service in each position provides necessary training for the next higher job in a line of progression within a department. In United States v. Jacksonville Terminal Co., *supra,* 451 F. 2d 418, this Court explained the heavy nature of the defendant's burden to justify a discriminatory seniority system:

> . . . We have no doubt that the seniority systems and restrictions currently enforced at the Terminal contributed to its safe and efficient operation. Nevertheless, as the Second Circuit most recently explained, "the 'business necessity' doctrine must mean more than that transfer and seniority policy serve legitimate management functions. Otherwise, all but the most blatantly discriminatory plans would be excused even if they perpetuated the effects of past discrimination. * * * Necessity connotes an irresistible demand. To be preserved, the seniority and transfer system must not only directly foster safety and efficiency of a plant, but also be essential to those goals. * * * If the legitimate ends of safety and efficiency can be served by a reasonably available alternative system with less discriminatory effect, then the present policies may not be continued." United States v. Bethlehem Steel Corp., 2d Cir. 1971, 446 F. 2d 652, 662 [1971]. In other words, management convenience and business

---

nal Co., *supra,* 451 F.2d at 451; Long v. Georgia Kraft Co., *supra,* 450 F.2d at 562; Bing v. Roadway Express, Inc., *supra,* 444 F.2d at 690-691; Local 189, United Papermak. & Paperwork. v. United States, *supra,* 416 F.2d at 989-990.

**89.** The determinants under the *Robinson* formulation have essentially been applied by

this Court, dressed in different wording, in United States v. Jacksonville Terminal Co., *supra,* 451 F.2d at 451; and Local 189, United Papermak. & Paperwork. v. United States, *supra,* 416 F.2d at 989.

**90.** 474 F.2d at 918.

necessity are not synonymous. Thus the Terminal was required to prove *not only that the seniority systems and restrictions promote safe and efficient operation but also that they are essential to these goals.* *Id.* at 451.

Under the three prongs of the *Robinson* standard,[91] the business purpose, training to insure safe and efficient plant operation, must be "sufficiently compelling to override any racial impact;" the department seniority system must effectively and efficiently carry out its training purpose; and there must be no alternate acceptable practice of accomplishing this training. In an industry involving sophisticated machining processes such as many of the operations of this company, training of employees for skilled positions is a necessary function for the continued economic life of the business. However, a *depart-mental* seniority system is effective and efficient as an instruction program only as to those positions in a line of progression where the jobs below them on the ladder serve as prerequisite training steps.[92] Thus, in a departmental line of progression where the positions do not require specific training[93] or where on-the-job experience in *another* department qualifies an employee,[94] a departmental seniority system is not efficient and it is certainly not the best training method.[95]

The company has evidence in the record that significant portions of its operations require skillful craftsmen-ship, but it has failed to demonstrate that every position at the plant is so complex or specialized as to require, without exception, step by step job progression within each department. The record discloses no proof by the company that positions in other than craft or

91. 444 F.2d at 798, n. 6 and 7.

92. In Robinson v. Lorillard Corp., *supra*, the company justified their departmental seniority system by asserting "that employees will perform a job more efficiently if they have prior experience in other jobs within the same department." *Id.* at 799. In rejecting it, the court made the following caveat:

> "Finally, it is difficult to imagine how even the necessity for job progression could constitute the business necessity which would justify a departmental seniority system that perpetuated the effects of prior discriminatory practices. For, after all, seniority is necessarily an inefficient means of assuring sufficient prior job experience. It may take only six months to learn a job well and become qualified for advancement. Yet the vagaries of chance may present an opportunity for advancement in only six weeks or not for six years. When some employees have been discriminatorily denied entry to the department, an alternate promotion system could advance the employee who has been discriminated against if he has the greatest employment seniority and has served the necessary minimum time in his present job or has satisfactorily established his capacity to handle the job. Such an alternate plan would accomplish the business purpose 'equally well with a lesser differential racial impact.' " *Id.* at 799–800.

93. In pointing out the inability of a departmental seniority system to meet the business necessity test because it was ineffective and inefficient in furthering promotion by ability into jobs requiring no specific training, the court in United States v. N. L. Industries, *supra*, 479 F.2d at 366, observed:

> "In regard to the alleged need for prior experience within a department, we again point out that National Lead maintains no lines of progression within departments or between departments. The sole determinant for job selection is seniority and only seniority—not ability. Thus, as in *St. Louis-San Francisco Railway*, *supra*, 464 F.2d at 309, 'length of service becomes synonymous with qualified.' "

*See* Robinson v. Lorillard Corp., *supra*, 444 F.2d at 799–800.

94. Courts have refused the business necessity rationale and ordered carry over of employment seniority instead of job seniority where blacks have been excluded from a certain line of jobs and where by their prior experience, they are qualified for these positions. *E. g.,* Bing v. Roadway Express, Inc., *supra*, 485 F.2d at 449–452; 444 F.2d at 689–691; United States v. St. Louis-San Francisco Railway Co., *supra*, 464 F.2d at 308–309. In *Railway*, the court allowed black train porters to carry over their seniority into formerly all white brakemen positions because of their training in performing braking functions as porters. This occurred even though there was a separate training line of progression for brakemen. *Id.*

95. See note 92, *supra*, at 246.

technical lines of progression are functionally related. The plaintiffs themselves admit that craft positions require specific prerequisite training and experience. But we read the district court's findings[96] and the record[97] as providing no showing by the company that other lines of progression are functionally related.[98] Robinson v. Lorillard Corp., *supra,* 444 F.2d at 799.

The company here attempts what this Court found unsuccessful in United States v. Jacksonville Terminal Co., *supra,* 451 F.2d at 451–453. There the terminal sought to use a finding that "a few jobs at the Company provide training for other jobs," to establish functional lines of progression to legalize unit seniority under the business necessity rationale. This Court stated:

. . . The [craft seniority] systems and their concomitant promotion and transfer restrictions protect those with work experience in particular crafts and classes but do not ascertain whether these are the only individuals qualified or the "best qualified" to hold positions in those crafts and classes. *Id.*

In essence, we believe our instructions *infra* to the district court and the court's ability to shape appropriate equitable relief is comparable to the situation in Local 189, United Papermak. & Paperwork. v. United States, *supra,* 416 F.2d at 990, where: "In place of job security the court ordered the institution of a mill seniority system carefully tailored to assure that no employee would have a right to a job that he could not perform properly."

■ 2. *Injunctive relief.* The appellants ask that the district court be directed to require that vacancies be posted initially for *plant-wide* bidding and filled by a qualified employee with the greatest *plant-wide seniority.* In addi-

96. The district court's findings appear to be inconsistent. The court states at finding #13:

". . . The jobs in the lines of progression as practiced in each department are functionally related, one to the other, to afford training and experience to the incumbent necessary to advance and perform proficiently the higher rated jobs, and are functionally related to the performance of the department as a whole."

But then at finding #34, the court states: "The defendant does not maintain formal lines of progression in any of its departments. Pay groups or wage progression schedules govern the advancement of employees."

The answer to this apparent riddle is the conclusion of law drawn by the district court on the issue of business necessity:

"Alternately, the second question [business necessity], on this record, is deserving of an affirmative answer. The efficiency of defendant's operations is not only promoted by, but it also requires, service in a lower job qualification as a condition to promotion to a higher, *functionally* related one." (Emphasis added).

We think this clearly marks out that only to those jobs in lines of progression shown by the company *to be functionally related* does this finding of business necessity attach. The record thus far clearly reveals that only the craft positions are functionally related.

97. The testimony of the vice president and works manager and the department superintendents at trial indicates that in the mono-cast and pipe foundry employees within and without the department moved freely in the lines of progression; that in the mono-cast, inspection, and pipe foundry departments there is often jumping of positions in the lines of progression; that in the mono-cast, inspection, pipe foundry, fittings foundry, and steel foundry departments there are jobs which are similar to positions within other departments (e. g., forklift operator, crane operator, welder) from which skills can be transferred without training on the other departments' lines of progression; and that the machine shop has very few positions able to utilize skills learned in other parts of the plant. The plaintiffs' expert witness noted even more examples of where skills acquired in other department could be transferred to a job in another department, positions where no specific prerequisite training was necessary and places where jumping within the line of progression was possible. Lastly, evidence indicated that the lines of progression had only been put down on paper two months prior to trial.

98. We do not mean that on remand the company is precluded from presenting further evidence of positions requiring specific prerequisite training.

tion, red circling [99] and advance entry [100] are requested.

Under the "rightful place theory" we agree:

Under that theory [rightful place theory] blacks are assured "the first opportunity to move into the next vacancies and positions which they would have occupied *but for* wrongful discrimination and which they are qualified to fill." United States v. Georgia Power Co., 5 Cir. 1973, 474 F.2d 906. Thus blacks confined by discrimination to certain positions must be given the opportunity to transfer into the formerly "white" positions as vacancies occur in order to assume their "rightful place." A complete decree must give enough relief to insure that the transferred discriminatees are able to *maintain* their rightful place. Thus the rightful place theory dictates that we give the transferring discriminatee sufficient seniority carryover to permit the advancement he would have enjoyed, and to give him the protection against lay-offs he would have had, in the absence of discrimination. Bing v. Roadway Express, Inc., *supra*, 485 F.2d at 450.

Therefore, the district court should issue an injunction requiring: (1) the posting of vacancies plant-wide; [101] (2) the selection of "qualified" personnel for the vacancies on the basis of *plant-wide* seniority; [102] (3) transferring members of the class shall retain their plant-wide seniority for all purposes including promotion, lay-off, reduction-in-force, and recall; [103] (4) advance entry into jobs for which an employee in the class is "qualified" or for which no specific training is necessary; [104] (5) red circling of members of the class; [105] (6)

99. Red circling is a standard remedy for eliminating past discrimination which prevented employees from reaching higher jobs and is recognized as necessary since otherwise employees could not afford to take *training* jobs paying lower wages. Where the job from which the employee transfers pays more than the new job, where the new job is in a department where the top wage rate is greater than the rate of the old job, the employee is paid the wage rate of the old job, until he advances to a job paying more than that rate or until he voluntarily freezes himself in at the new job.

100. Advance entry would allow a transferring black employee to by-pass the entry level positions in a department to take a position higher in the line of progression either which does not require special training or for which his experience in another department qualifies him.
fn

101. *See* Head v. Timken Roller Bearing Co., *supra*, 486 F.2d at 878–879; Stamps v. Detroit Edison Co., *supra*, 365 F.Supp. at 116–117.

102. *See* Bing v. Roadway Express, Inc., *supra* 485 F.2d at 451; United States v. Georgia Power Co., *supra*, 474 F.2d at 926–927; United States v. Jacksonville Terminal Co., *supra*, 451 F.2d at 451–453; Griggs v. Duke Power Co., 420 F.2d 1225, 1236–1237 (4th Cir. 1970), rev'd on other grounds, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Long v. Georgia Kraft Co., 328 F.Supp. 681,

689 (N.D.Ga.1970), rev'd on other grounds, 450 F.2d at 559; Robinson v. Lorillard, 319 F.Supp. 835 (N.D.N.C.1970), aff'd. in part, 444 F.2d 791.

103. This Court is conscious of the testimony to the effect that part of the plant was to be reconstructed to update the company's method of pipe production, and that this would cause substantial changes, especially in the mono-cast department, resulting in the laying-off of employees. We have observed that past discrimination may penalize black employees in a reduction-in-force situation, and think that affirmative relief is necessary to remedy such effects. United States v. Hayes International Corp., 456 F.2d at 119. *Cf.*, United States v. Jacksonville Terminal Co., *supra*, 451 F.2d at 445–446, 449–450. *See* Williams v. Bethlehem Steel Corp., 468 F.2d 1201 (2d Cir. 1972), cert. denied, 411 U.S. 931, 93 S.Ct. 1893, 36 L.Ed.2d 390 (1973); United States v. Bethlehem Steel Corp., *supra* 446 F.2d at 664, 666. The district court should be mindful of this consideration in granting *complete* affirmative relief.

104. United States v. Hayes International Corp., *supra*, 456 F.2d at 116–119; Long v. Georgia Kraft Co., *supra*, 450 F.2d at 562; Local 189, United Papermak. & Paperwork. v. United States, 301 F.Supp. at 917, aff'd., 416 F.2d 980.

105. United States v. Bethlehem Steel Corp., *supra*, 446 F.2d at 660, 665; United States v. N. L. Industries, *supra*, 479 F.2d at 375–

establishment of specific residency periods in lines of progression where the company has established prerequisite training as a "business necessity."[106] By the term "qualified" we mean ability which is *not* to be determined solely by reference to experience in the line of progression of a department, *e. g.* a forklift operator in the mono-cast department should be able to transfer to a forklift operator position in the fittings foundry or some other department, or an employee in a grinder position transferring to the inspection department. This has specific application in the advance entry situation. Assume a member of the class requests transfer to or bids for a position in another department above the entry level in the line of progression. If by his prior experience or because no training is necessary, he is qualified, advancement from entry level up the line of progression should be by-passed in order to insure this employee his "rightful place."[106a]

By eliminating the initial preference given employees within the department under the posting procedure and by requiring selection on plant-wide seniority, the prior discrimination which denied entrance and accumulation of seniority in the better paying departments to the majority of black employees will be tempered. For those members of the class who obtained entry but were denied accumulation of seniority within a higher paying department, plant-wide seniority will equalize competition for promotion. This restructuring of the bidding and seniority systems and the allowance of advance entry for transfers by black employees will assure the injured class members the opportunity "to move into the next vacancies and positions which they would have occupied but for wrongful discrimination."[107]

However, this does not aid the members of the class denied training and access to higher paying positions because of non-qualification. The red circling is designed for this remedial purpose. Black employees who were earlier blocked but now desire transfer to a department where the top pay grade and advancement opportunities are greater than in their former department, are handicapped by their lack of training for the positions in the new department. Therefore, where a job from which the black employee transfers pays more than the new job in a department where the top pay grade is greater than the rate of the old job, a member of the class shall be paid the wage rate of the old job until he advances to a position paying more than that rate or until he voluntarily freezes himself in at the new job.

376; Local 189, United Papermak. & Paperwork. v. United States, *supra*, 301 F.Supp. at 917, 923, aff'd., 416 F.2d 980; Robinson v. Lorillard, *supra*, 319 F.Supp. 835, 839, 843, aff'd. in part, 444 F.2d 791; Clark v. American Marine Corp., 304 F.Supp. 603, 608 (E.D.La.1969).

106. As the author of one article commented: "On the other hand, where the line of progression technique has been adopted simply to channel and rationalize job movements in a departments, other techniques for demonstrating qualifications such as testing or the use of 'probation periods' could be utilized and the 'rightful place' approach applied. Even where the transferring Negroes must follow the established *cursus honorum* of the line of progression, a minimum period of occupancy for each job should be defined, so that Negroes who had worked in a job for the designated period could be presumed to have acquired the skills necessary to be eligible for the next vacancy in the following job." Note, Title VII, Seniority Discrimination and the Incumbent Negro, 80 Harv.L.Rev. 1260, 1279 (1967).

*See* note 92, *supra* at 246.

*See* Local 189, United Papermak. & Paperwork. v. United States, *supra*, 301 F.Supp. at 917, 925–930, aff'd., 416 F.2d at 990; Robinson v. Lorillard Corp., *supra*, 444 F.2d at 799–800.

106a. *See* Bing v. Roadway Express, Inc., *supra*, 485 F.2d at 449–452, 444 F.2d at 689–691; United States v. St. Louis-San Francisco Railway Co., *supra*, 464 F.2d at 308–309. See note 94, *supra* at 246.

107. United States v. Georgia Power Co., *supra*, 474 F.2d at 927.

## C. Changes in the Apprentice and On-The-Job Training Programs

While restructuring the promotion procedures will substantially aid the advancement of previously excluded class members into non-craft departments and jobs, the necessary line of progression training will continue to delay obtaining of *craft* positions by black employees. For that reason changes are necessary in the programs, apprenticeship and journeyman, designed to provide training for craft positions.

The age requirement, twenty-five years or twenty-nine for those having served in the military, for entry into the apprentice program is an unnecessary dilatory barrier. The company does not attempt to overcome its racial impact under a "business necessity" rationale.[108] Therefore, the district court should enjoin the continuance of the age prerequisite for the apprentice program. On remand, the company may present evidence that another limit other than the thirty-five years endorsed by plaintiffs' expert should be established, but this would require a compelling interest of the company.[109]

Likewise, the training periods for the apprenticeship and on-the-job training, given the exclusion of black employees, are unnecessarily long. The company has made no showing that the three and one-half to four years for apprenticeship or seven years for journeymen are periods required by "business necessity." *Cf.,* Local 189, United Papermakers & Paperworkers v. United States, *supra,* 301 F.Supp. at 917, aff'd, 416 F.2d 980.

On remand, either by agreement of the parties or order of the court after a hearing, if necessary, the length of the apprenticeship should be shortened with varying periods allowed according to each craft's requirements, and the three years qualifying experience on a craft related job and the length of the on-the-job training, itself, should be shortened.[110] In addition, consideration should be given to broadening the qualifying experience on a craft related job to include comparable experience on jobs *outside* craft departments. The court should examine for adverse impact the use of *subjective* selection criteria, since the trial, in the journeyman program.

On remand, the company may advance reasoning that the present length of the apprenticeship and journeyman are, for training purposes, a "business necessity." However, the district court should pay heed to the conclusions in Moody v. Albemarle Paper Co., 474 F.2d 134, 140 (4th Cir. 1973). In that case, the company hired all employees into a pool. From the pool employees were moved into lines of progression as vacancies occurred. Since the company did not know in advance in which line a vacancy would occur, it required all employees in the pool to be qualified for all the lines. The court, in considering a business necessity argument, held that:

> Albemarle has not shown that hiring all employees into a pool is necessary for the safe and efficient operation of the business, nor has it shown that hiring employees for specific lines of progression is not an acceptable alter-

108. The company argues that the age and educational qualifications had little or no detrimental effect on black employees because the on-the-job training was available without these prerequisites. Instead of supporting, this argument undermines the company's position. Under the "business necessity" standard an acceptable alternative is *prima facie* proof that such age requirement is *not* necessary for effective and efficient plant operation.

109. Carter v. Gallagher, 452 F.2d 315, 326 (8th Cir. 1972) (en banc), cert. denied, 406 U.S. 950, 92 S.Ct. 2045, 32 L.Ed.2d 338 (1972) (employment discrimination under section 1981, maximum age limit raised to thirty-five). Equal Employment Opportunity Commission has found maximum age requirements for apprenticeship to be tainted where they perpetuate past discrimination. CCH EEOC Decisions ¶ 6269, ¶ 6291 (1973).

110. United States v. Operating Engineers, 4 EPD ¶ 7944 at 6507–08 (N.D.Calif.1972).

native. This they were required to prove to justify their policies under the business necessity test. *Id.*

Similarly, the record here reveals that a craft-trainee for the machine shop is required to operate all machines proficiently. An alternative might be to require a shorter training period and to train an employee to operate a particular machine. We recognize, however, that a "jobbing machine shop" is different from a paper factory. The business necessity rationale exists to take into account such situational differences.

### D. Back Pay

The appellants request back pay for members of the class, arguing that the district court abused its discretion in refusing such an award. The district court had ruled: [111]

Alternately, in the exercise of discretion, LeBlanc v. Southern Bell T & T Company, 460 F.2d 1228 (5th Cir. 1972), and Johnson v. Georgia Highway Express, 417 F.2d 1122 (5th Cir. 1969), the Court declined to award back pay in view of the demonstrated good faith compliance by defendant with Title VII, LeBlanc v. Southern Bell T & T Company, *supra*, and Parham v. Southwestern Bell Telephone Company, 433 F.2d 421 (8th Cir. 1970), and because such an award is not necessary to insure future compliance therewith. Phelps Dodge Corporation v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).

These bases are improper for denying back pay. The district court should structure a back pay decree to conform with the analysis below.

1. *Abuse of discretion.* The standard of review for an appellate court in determining whether a district court has abused its discretion by failing to fully remedy employment discrimination by denying back pay was suggested by the Supreme Court in Newman v. Piggie Park Enterprises, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). The statute there, Title II of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000a–3(b), provided that "the prevailing party" is entitled to a "reasonable attorney's fee" in the *court's "discretion."* The Supreme Court determined that Congress's purpose for enacting this provision limited the scope of discretion which a district court had in denying attorney's fees.[112] Likewise, the parameters of discretion, within which a district court may deny back pay in employment discrimination cases, are defined by the purpose for which Congress enacted, and the courts have interpreted, the statutory back pay provisions.[113] Congress in authorizing courts, expressly under Title VII [114] and

---

111. The district court, secondarily, relied on a finding that a back pay award would be inequitable. This will be discussed *infra.*

112. The Supreme Court outlined how this discretion should be exercised:

"It follows that one who succeeds in obtaining an injunction under that Title should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." 390 U.S. at 402.

113. In applying the standard of review modeled after *Piggie Park*, the court in Moody v. Albemarle Paper Co., *supra*, 474 F.2d 134, stated: "Where a district court fails to exercise discretion with an eye to the purposes of the Act, it must be reversed. Wirtz v. B. B. Saxon Co., 365 F.2d 457 (5th Cir. 1966); Shultz v. Parke, 413 F.2d 1364 (5th Cir. 1969)." *Id.* at 141.

114. *See* 42 U.S.C.A. § 2000e–5(g) (Supp. 1973).

Although this provision speaks in terms of relief awarded because of "intentional" discrimination, this has consistently been construed by this Court and others to read that "the defendant meant to do what he did, that is, his employment practice was not accidental." Local 189, United Papermakers & Paperworkers v. United States, *supra*, 416 F. 2d at 996. *See* Schaeffer v. San Diego Yellow Cabs, 462 F.2d 1002, 1006 (9th Cir. 1972); United States v. Jacksonville Terminal Co., *supra*, 451 F.2d at 442–443; Robinson v. Lorillard Corp., *supra*, 444 F.2d at 796–797; Sprogis v. United Air Lines, 444 F.2d 1194, 1201 (7th Cir. 1971), cert. denied, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971); Jones v. Lee May Motor Freight, Inc., *supra*, 431 F.2d at 250. *But*

impliedly under section 1981,[115] to grant equitable relief to persons harmed by employment discrimination, included the discretion to award back pay. This Court [116] and commentators [117] have noted that the provision for back pay in Title VII was modeled on the similar provision in the National Labor Relations Act, 29 U.S.C.A. § 160(c), whose object is "designed to vindicate the public policy of a statute by making the employees whole for losses suffered on account of an unfair labor practice." [118] Nathanson v. NLRB, 344 U.S. 25, 27, 73 S.Ct. 80, 97 L.Ed. 23 (1952). An award of back pay has been recognized by this Court as not a "mere adjunct of some more basic equity" but as an "integral part of the whole relief which seeks, not to punish the respondents but to compensate the victim of discrimination." United States v. Georgia Power Co., supra, 474 F.2d at 921. Johnson v. Good-

year Tire & Rubber Co., supra, 491 F.2d at 1375; Johnson v. Georgia Highway Express, supra, 417 F.2d 1122. Under Title VII and section 1981 the injured workers must be restored to the economic position in which they would have been but for the discrimination—their "rightful place." [119] Because of the compensatory nature [120] of a back pay award and because of the "rightful place" theory, adopted by the courts, and of the strong congressional policy, embodied in Title VII, for remedying employment discrimination, the scope of a court's discretion to deny back pay is narrow. Head v. Timken Roller Bearing Co., supra, 486 F.2d at 876; Moody v. Albemarle Paper Co., supra, 474 F.2d at 141–142. Once a court has determined that a plaintiff or complaining class has sustained economic loss from a discriminatory employment practice, back pay

see, Dewey v. Reynolds Metals Co., 429 F.2d 324, 331 (6th Cir. 1970), aff'd. per curiam, 402 U.S. 689, 91 S.Ct. 2186, 29 L.Ed.2d 267 (1971) (equally divided court).

115. Johnson v. Goodyear Tire & Rubber Co., supra, 491 F.2d at 1375–1380; Head v. Timken Roller Bearing Co., supra, 486 F.2d 874–875; Brown v. Gaston County Dyeing Machine Co., supra, 457 F.2d 1377; Caldwell v. National Brewing Co., supra, 443 F.2d 1044; Sanders v. Dobbs Houses, supra, 431 F.2d at 1101; Lazard v. Boeing Co., supra, 322 F. Supp. 345–346. Cf. Sullivan v. Little Hunting Park, supra, 396 U.S. at 238–240.

116. Johnson v. Goodyear Tire & Rubber Co., supra, 491 F.2d at 1377 n. 37, 1380, nn. 52–53; United States v. Georgia Power Co., supra, 474 F.2d at 921, n. 19.

117. Davidson, "Back Pay" Awards Under Title VII of the Civil Rights Act of 1964, 26 Rutgers L.Rev. 741, 741–42 (1973) (hereinafter cited as Back Pay); Comment, Developments in the Law—Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1259 n. 349 (1971).

118. The rationale for a back pay award under section 1981 is similar, but, of course, other types of damages might also be possible under section 1981. Lazard v. Boeing Company, supra, 322 F.Supp. at 345–346. Cf. Sullivan v. Little Hunting Park, supra, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386;

Head v. Timken Roller Bearing Co., supra, 486 F.2d at 874–875.

119. This rationale that back pay is compensatory in nature and necessary in order to grant full relief in employment discrimination suits has been recognized by other courts, also. See Head v. Timken Roller Bearing Co., supra, 486 F.2d at 876–878; Moody v. Albemarle Paper Co., supra, 474 F.2d at 141–142; Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 720 (7th Cir. 1969); Stamps v. Detroit Edison Co., supra, 365 F. Supp. at 119, 121–122; Tidwell v. American Oil Co., 332 F.Supp. 424, 437 (D.Utah 1971).

120. From the employer's viewpoint back pay may be a punishment. But just as the National Labor Relations Act, Title VII was written to protect the employee. Not only has the company violated a strong public policy against racial discrimination here, but it has substantially injured this class of black workers. "As between the obviously innocent discriminatee and the employer who may have some equities on his side [good faith], it seems fairer to require the employer with his usually superior resources to bear the loss. This generous approach with an emphasis on compensation of the employee is found in the NLRA cases and in several noteworthy Title VII decisions." Back Pay, supra note 117, at 745, nn. 33, 34.

should normally be awarded unless special circumstances are present.[121]

The district court's reasons for denying back pay must next be examined for evidence of "special circumstances."[122] The primary contentions relied on by the court were (1) that the company had demonstrated good faith compliance with Title VII and (2) that a back pay award was not necessary to insure future compliance by the company. As expounded earlier the raison d'etre of a back pay award is to compensate victims of discrimination for economic loss, not to punish the discriminating employer or insure future compliance. Neither the past good faith of the company nor the possibility of future violations of Title VII is relevant. Whether black workers were economically injured by unlawful discrimination and require a back pay award to make them whole is the issue.

As to an assertion of good faith, the Supreme Court in *Griggs* pointed to *consequences* not motives. 401 U.S. at 432. Likewise, this Court has specifically rejected good faith as a defense to a back pay award in Johnson v. Goodyear Tire & Rubber Co., *supra*, 491 F.2d at 1375–1377, n. 37. In rejecting good faith as a proper legal basis for denying back pay here, we adopt the reasoning of the court in Robinson v. Lorillard, *supra*, 444 F.2d 791:[123]

Next it is argued that back pay should not be awarded in the absence of specific intent [good faith] to discriminate. A corollary argument is that the award was improper in light of the unsettled state of the law. The principal answer to both points is that back pay is not a penalty imposed as a sanction for moral turpitude; it is compensation for the tangible economic loss resulting from an unlawful employment practice. Under Title VII the plaintiff class is entitled to compensation for that loss, however benevolent the motives for its imposition. *Id.* at 804.

*See* Head v. Timken Roller Bearing Co., *supra*, 486 F.2d at 877; Moody v. Albemarle Paper Co., *supra*, 474 F.2d at 141. *But see,* United States v. St. Louis-San Francisco Railway Co., *supra*, 464 F.2d at 311, 313; Baxter v. Savannah Sugar Refining Corp., *supra*, 350 F.Supp. 146. *Compare* United States v. St. Louis-San Francisco Railway Co., *supra, with* United States v. N. L. Industries, *supra,* 479 F.2d at 378–380.

The issue of future compliance is of course pertinent in deciding whether or not to provide equitable relief against future discriminatory practices, *e. g.* a permanent injunction. Back pay, however, is an equitable award for *past* economic injury.

The district court, secondarily, relied on a finding[124] as to the "inequity" of

---

121. Both the Fourth Circuit and Sixth Circuit Courts of Appeal have adopted this standard. Head v. Timken Roller Bearing Co., *supra*, 486 F.2d at 876; Moody v. Albemarle Paper Co., *supra*, 474 F.2d at 142.

122. Courts, in the past, have denied back pay for a variety of reasons: (1) the unsettled nature of the law concerning a particular practice, *compare* United States v. St. Louis-San Francisco Railway Co., *supra*, 464 F.2d at 311, 313, *with* United States v. N. L. Industries, *supra*, 479 F.2d at 378–380; (2) the good faith of an employer, United States v. St. Louis-San Francisco Railway Co., *supra*; Baxter v. Savannah Sugar Refining Corp., *supra*, 350 F.Supp. at 146; (3) a state statute conflicting with Title VII (see the cases cited at note 125, *infra* at 254); (4) and impossibility of determining the period

for which back pay is to be awarded, United States v. St. Louis-San Francisco Railway Co., *supra*.

123. This Court in Rowe v. GMC, *supra*, 457 F.2d 348, set out with particularity the good faith of General Motors. *Id.* at 355–356. Nevertheless, the case was remanded with instructions for the district court to, "of course include the appropriate remedy, back pay, limited or full, etc., as needed to effectuate the Act." *Id.* at 360. Compare the good intent of the employer in *Griggs*. 401 U.S. at 432.

124. In finding #31, the court stated: "Any award of back pay would penalize those black employees, as well as white employees, who strove to improve themselves and their job performance during

granting back pay. The discretion a court has under the "special circumstances" standard encompasses a denial of back pay on the grounds of substantial injustice. Moody v. Albemarle Paper Co., *supra*, 474 F.2d at 142. *Cf.* Newman v. Piggie Park Enterprises, *supra*, 390 U.S. at 402.

The "special circumstances" where an unjust result has prevented an award of back pay have been narrow. The most numerous are sex discrimination suits where conflicting state legislation, which limit work hours or impose weight lifting limits or the like for women employees, require a practice in violation of Title VII. In these cases the courts have properly declined to award back pay because "state statutes, like federal ones, are entitled to the presumption of constitutionality until their invalidity is judicially declared." [125] Davies Ware-

house Co. v. Bowles, 321 U.S. 144, 153, 64 S.Ct. 474, 479, 88 L.Ed. 635 (1944). However, a back pay decree is appropriate in those cases where a limitation is not imposed by a state statute but by the employer,[126] or where the employer is put on notice of a judicial or definitive administrative determination of the invalidity of the state law.[127]

In this case, except for the "extra compensation" plan the district court clearly erred in its conclusions regarding injustice to the company.[128] Even the argument that distributions to employees out of earned surplus (the extra compensation plan) would be reduced, penalizing all employees, is hyperbolic and misleading. Since the workers are, in essence, the stockholders of the company,[129] they, *like any stockholders*, should help bear the burden of a back pay award. Any injustice results from

---

the period in question. Due to the laudable and unique 'extra compensation' plan whereby no earnings are paid outside the company and the employees, both black and white alike, share in the earnings of the defendant, any award of back pay would reduce the earnings of the company available for distribution to the employees, and would penalize all employees of the company. An award of back pay to black employees who were passed over for better jobs for a lack of appropriate test score, when there were also white employees who were not promoted for the same reason, would be an inequitable and unconscionable result. An award of back pay to black employees who were passed over for better jobs for a lack of appropriate test scores, when the job vacancy was awarded a black employee with the appropriate test score would likewise be an inequitable and unconscionable result, and unauthorized by Title VII since no racial overtone can be attributed by the selection of one black over another black."

125. *E. g.*, Kober v. Westinghouse Electric Corp., 480 F.2d 240, 246–250 (3rd Cir. 1973) ; United Steel Workers of America, Local 1104 v. United States Steel Corp., 478 F.2d 1255 (6th Cir. 1973) ; Manning v. International Union, 466 F.2d 812 (6th Cir. 1972), cert. denied, 410 U.S. 946, 93 S.Ct. 1366, 35 L.Ed.2d 613 (1973) ; Weeks v. Southern Bell T & T Co., 408 F.2d 228 (5th Cir. 1969) ; LeBlanc v. Southern Bell T & T Co., 333 F.Supp. 602 (E.D.La.1971), aff'd.

per curiam, 460 F.2d 1228 (5th Cir.), cert. denied, 409 U.S. 990, 93 S.Ct. 320, 34 L.Ed. 2d 257 (1972).

126. Bowe v. Colgate-Palmolive Co., *supra*, 416 F.2d 711 (weight lifting limitation).

127. *Compare* Rosenfeld v. Southern Pacific Co., 444 F.2d 1219 (9th Cir. 1971) *with* Schaeffer v. San Diego Yellow Cabs, *supra*, 462 F.2d 1002.
 Since the Supreme Court indicated in *Griggs* (401 U.S. at 443–444) that administrative interpretations by the EEOC, as the enforcing agency, are entitled to great deference, a definitive administrative ruling on a conflicting state statute may be sufficient notice. 29 C.F.R. §§ 1604.1(b), 1604.2(b). *See* Schaeffer v. San Diego Yellow Cabs, *supra*, 462 F.2d at 1007–1008; Manning v. International Union, *supra*, 466 F.2d at 816. *Cf.* 42 U.S.C.A. § 2000e–12(b).

128. Since promotion continues to be determined by plant-wide seniority and ability, no employees are hurt because they improved their position during this period of discrimination. The testing had a discriminatory effect on black employees as *compared* to white workers. In other words, these tests were probably accurate measuring devices as applied to white employees but not as applied to black employees. *Qualified* black workers were not being promoted with their white co-workers or fellow black employees able to hurdle the improper testing.

129. See the explanation of the company's unusual organization, *infra* at IV.

the fact that this class of black workers will again be penalized economically. Moreover, a majority of white employees have enjoyed swifter job advancement with consequential salary increases *because* qualified black workers have been discriminatorily hampered in competition for promotion. At the same time a majority of black employees endured substantial economic losses. To assert now that reductions in the distribution from earned surplus which *all* employees will suffer can somehow defeat an award of back pay is peculiarly unpersuasive.

The present suit offers an additional situation falling within "special circumstances." Since the plaintiffs allege violations of 42 U.S.C.A. § 1981, as well as Title VII, a back pay award might be thought to extend to a period prior to July 2, 1965, the effective date of Title VII, under section 1981, subject to the applicable statute of limitations.[130] Head v. Timken Roller Bearing Co., *supra*, 486 F.2d at 874–875; Brown v. Gaston County Dyeing Machine Co., *su-*

*pra*, 457 F.2d 1377 (back pay ordered for 1961 to 1962 under section 1981). In this Circuit, private employment practices were not held violative of section 1981 until 1970 in Sanders v. Dobbs House, *supra*, 431 F.2d at 1099, although the Supreme Court laid the foundation for this holding in 1968 in Jones v. Alfred H. Meyer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).[131] The question becomes whether a back pay award under section 1981 for a period prior to 1970 (or 1968 or 1965) constitutes a substantial injustice because of lack of notice to employers of a *statutory scheme* prohibiting discriminatory employment practices.[132]

The specific prohibitions of Title VII were adequate notice to employers post July 2, 1965. Johnson v. Goodyear Tire & Rubber Co., *supra*, 491 F.2d at 1378. In Schaeffer v. San Diego Yellow Cabs, *supra*, 462 F.2d at 1007–1008, the court found back pay applicable from the time the employer had notice that a state statute, conflicting with Title VII, was invalid. Similarly, here the

130. This Court in Boudreaux v. Baton Rouge Marine Contracting Co., *supra*, 437 F.2d at 1017 n. 16, indicated that the state statute of limitations governing contract claims, specifically back wages, is controlling on a back pay claim under section 1981. *See* Green v. McDonnell Douglas Corporation, 463 F.2d 337, 340–341 (8th Cir. 1972); Young v. International T. & T. Co., *supra*, 438 F.2d at 763. In *Boudreaux*, it was also established that the statute of limitations is tolled when a plaintiff seeks relief, such as filing a complaint, through the EEOC. *See* Culpepper v. Reynolds Metal Co., 421 F.2d 888, 891–893 (5th Cir. 1970); Henderson v. First National Bank of Montgomery, 344 F.Supp. 1373, 1376–1377 (M.D.Ala.1972).

131. It is clear that applying section 1981 to private employment practices in effect prior to these decisions is not a question of retroactivity. In Miller v. Amusement Enterprises, 426 F.2d 534 (5th Cir. 1970), this Court stated:

"In our former decision we were not dealing with retroactive effect of a change in the law, we were dealing with the effect of a statute which was in force at the time of Appellee's racially discriminatory actions. The question was whether the Civil Rights Act of 1964 covered the ac-

tivities under scrutiny. If so, the Courts —trial or appellate—were to so declare together with such remedial sanctions as were appropriate. But the actions of Fun Fair Park became subject to the prescribed judicial relief not because the Court said so, but rather because the Court said—even perhaps for the first time—that the Congress said so." *Id.* at 536.

132. We are not intimating that the unsettled nature of the law concerning a particular practice can defeat a back pay claim. There is substantial difference between lack of notice of a statutory scheme prohibiting, for the first time, all discriminatory employment practices and lack of notice that a practice which excludes blacks from hiring or promotion, violates such a statutory scheme. Miller v. Amusement Enterprises, *supra*, 426 F. 2d at 536. This defense, the unsettled nature of the law, has been specifically rejected by this Court in Johnson v. Goodyear Tire & Rubber Co., *supra*, 491 F.2d at 1377, n. 41, and by the Court of Appeals for the Fourth Circuit in Moody v. Albemarle Paper Co., *supra*, 474 F.2d at 141; and Robinson v. Lorillard Corp., *supra*, 444 F.2d at 804. *Contra*, United States v. N. L. Industries, *supra*, 479 F.2d at 378–380.

company was put on sufficient guard by the enactment of Title VII to be found liable for back pay under section 1981 as of July 2, 1965. However, following the reasoning of this Court's decision in Johnson v. Goodyear Tire & Rubber Co., *supra*, 491 F.2d at 1378, 1379, we conclude that back pay awards under section 1981 should not cover any period of employment prior to the effective date of Title VII because of insufficient notice. Brown v. Gaston County Dyeing Machine Co., *supra*, 457 F.2d at 1385–1387 (Dupree, dissenting in part).

■ 2. *Persons entitled to back pay.* In *Georgia Power*, this Court expressly left undecided the question of "the availability of back pay to non-named class members in § 2000e–5(g) actions." 474 F.2d at 919 n. 16. This Court, most recently answered this question affirmatively in Johnson v. Goodyear Tire & Rubber Co., *supra*, 491 F.2d 1375.

Whether unnamed class members, who have not filed charges with the EEOC, may be included in a back pay award in a private Title VII suit is a question that must be considered both in light of Title VII and section 1981 requirements and of the limits imposed by Fed.R.Civ. P. 23, pertaining to class actions.[133] Title VII does not exclude unnamed or non-filing class members from a back pay decree because of failure to exhaust remedies, 42 U.S.C.A. § 2000e–5(a)–(e) (1972), with the EEOC. Courts have allowed employees who have filed with the EEOC to represent a class whose members have not all filed[134] and have approved the intervention of non-filing class members.[135] The basis for these decisions is that the opportunity for investigation and conciliation by the EEOC is adequately fulfilled by the filing of one charge of discrimination against an employer, so that filing further claims would be superfluous. Furthermore, even if Title VII restricted class membership for back pay purposes to named persons who had filed a charge with the EEOC, section 1981 would independently support an unrestricted class award of back pay.[136]

■ ■ A class-wide back pay award is limited by Rule 23 only to the extent that the class might not be maintainable under subdivision (b)(2).[137]

Subdivision (b)(2) requires:

> (2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

The crucial language is "injunctive relief" or "corresponding declaratory relief." The issue is whether an award of back pay qualifies as such or can be included as relief in a (b)(2) class action.

Subdivision (b)(2) is "keyed to the effect of the relief sought, and the pragmatic ramifications of adjudication in each situation, rather than any special attributes of the class involved." 3B

---

133. This subject is thoroughly treated in Comment, Back Pay In Class Actions and Pattern or Practice Suits Under Title VII of the Civil Rights Act of 1964, 23 Emory L.J. 163, 165–78 (1974), and Back Pay, *supra*, note 117, at 747–51.

134. *E. g.*, Head v. Timken Roller Bearing Co., *supra*, 486 F.2d at 876, n. 9; Moody v. Albemarle Paper Co., *supra*, 474 F.2d 134; Robinson v. Lorillard Corp., *supra*, 444 F.2d at 801–802; Sprogis v. United Air Lines, *supra*, 444 F.2d at 1201–1202; Oatis v. Crown Zellerbach Corp., *supra*, 398 F.2d 496; Stamps v. Detroit Edison Co., *supra*, 365 F. Supp. at 120–122. *Cf.* United States v. Georgia Power, *supra*, 474 F.2d at 925;

Johnson v. Georgia Highway Express, *supra*, 417 F.2d at 1125; Miller v. International Paper Co., 408 F.2d 283, 288–291 (5th Cir. 1969).

135. *E. g.*, Bowe v. Colgate-Palmolive Co., *supra*, 416 F.2d at 719–721.

136. Caldwell v. National Brewing Co., *supra*, 443 F.2d 1044; Young v. International T & T Co., *supra*, 438 F.2d 757; Henderson v. First National Bank of Montgomery, *supra*, 344 F.Supp. at 1376–1377.

137. Only subdivision (b)(2) is alleged in the plaintiffs' complaint. Subdivision (b)(3) is also available. *See* Bing v. Roadway Express, *supra*, 485 F.2d at 447.

Moore's Federal Practice ¶ 23.45 [1] at 703 (2d Ed. 1969). In other words, the language, " 'final injunctive relief or corresponding declaratory relief' is 'appropriate,' " describes the situation in which a class can be recognized, as one in which this type of relief is appropriate. This is not to be read as saying "thereby making appropriate *only* final injunctive relief or corresponding declaratory relief." All that need be determined is that conduct of the party opposing the class is such as makes such equitable relief appropriate. This is no limitation on the power of the court to grant other relief to the established class, especially where it is required by Title VII and section 1981. *Cf.* Sprogis v. United Air Lines, *supra,* 444 F.2d at 1201–1202. Back pay has been granted by courts in (b)(2) class actions where injunctive or declaratory relief has also been requested,[138] and even where the need for injunctive relief has been obviated before trial by the defendant's own actions.[139]

The objection that back pay will vary from class member to class member is not overriding. Once class-wide discrimination has been demonstrated to result in disproportional earnings, a class-wide decision that back pay is appropriate can be discerned without deciding which members of the class are entitled to what amounts. Robinson v. Lorillard Corp., *supra,* 444 F.2d at 802 n. 14. This is no different than affirmative injunctive relief, in the form of red circling or advance entry, which on remand will be applied to particular individuals and not the whole class. *Cf.* Bing v. Roadway Express, *supra,* 485 F. 2d at 448, n. 5. No one has suggested that this violates the dictates of subdivision (b)(2). Likewise; the problem of binding unidentified class members may be overcome by particularizing the class members at some point in the litigation [140] or utilizing the notice provision of subdivision (d)(2).[141]

In essence, we think: "This is a case in which final injunctive relief is appropriate and the defendants' liability for back pay is rooted in grounds applicable to all members of the defined class. Under these circumstances the award of back pay, as one element of the equitable remedy, conflicts in no way with the limitations of Rule 23(b)(2)." [142] Rob-

---

138. Johnson v. Goodyear Tire & Rubber Co., *supra,* 491 F.2d at 1375; Robinson v. Lorillard Corp., *supra,* 444 F.2d at 801–802; Bowe v. Colgate-Palmolive Co., *supra,* 416 F.2d at 720; Baxter v. Savannah Sugar Refining Corp., *supra,* 350 F.Supp. at 141. *See* Head v. Timken Roller Bearing Co., *supra,* 486 F.2d at 876, n. 9; Stamps v. Detroit Edison Co., *supra,* 365 F.Supp. at 120–122. *But see,* Walker v. City of Houston, 341 F.Supp. 1124, 1131–1132 (S.D.Tex. 1971); Muller v. Curtis Publishing Co., 57 F.R.D. 532, 536 (E.D.Pa.1973); 3B Moore's Federal Practice ¶ 23.40 (Supp.1972).

139. Arkansas Education Association v. Board of Education, 446 F.2d 763, 767–768 (8th Cir. 1971). *Contra,* Baham v. Southern T & T Co., 55 F.R.D. 478, 480–481 (N.D.La. 1972).

140. In Bing v. Roadway Express, *supra,* 485 F.2d at 446–449, and Sprogis v. United Air Lines, *supra,* 444 F.2d at 1201–1202, the class was not defined until *after* the trial.

141. Our recent decision in Bing v. Roadway Express, *supra,* 485 F.2d at 446–449, is illustrative of how notice may be used under

subdivision (d)(2). *See* Rosen v. Public Service Electric and Gas Co., *supra* 477 F.2d at 96 n. 11.

142. The appropriateness of the treatment of back pay claims in a class-wide manner, was outlined in *Back Pay, supra* note 117, at 750:

"Subdivision (c)(4) of Rule 23 permits questions individual to each member of the class to be omitted from the class action and left to individual actions. Practical consideration suggests that individual questions in back pay class actions should not be so handled. While questions as to back pay period and rate may not be identical with respect to all members of a class, they may be determined from the same source of evidentiary data: the employer's personnel records and practices. It would doubtless be economical to consider these questions with respect to all class members at the same time. Furthermore, requiring separate actions for back pay would burden courts and counsel alike with duplicative tasks and repetitive paperwork. Finally, discriminatees are often reluctant to sue because of fear. Pol-

inson v. Lorillard Corp., *supra,* 444 F.2d at 802. *Cf.* Johnson v. Goodyear Tire & Rubber Co., *supra,* 491 F.2d 1364.

3. *Determination of the award.* Having decided that the district court should grant back pay to the members of the class, a multitude of questions arise concerning the period of time encompassed by the back pay, the burden of proof, and the mechanics of computation. Some guidelines for the district court will be set forth.

Initially, we approve the district court's intention of referring the back pay claims to a Special Master, Fed.R. Civ.P. 53. United States v. Wood, Wire & Metal Lathers Int. Union, Local 46, 328 F.Supp. 429, 441 (S.D.N.Y.1971). However, the court and the parties may also consider negotiating an agreement. *E. g.,* Johnson v. Goodyear Tire & Rubber Co., 349 F.Supp. 3, 18 (S.D.Tex. 1972), 491 F.2d 1364 (5th Cir. March 27, 1974); United States v. Wood, Wire & Metal Lathers, Int. Union, Local 46, *supra* 328 F.Supp. at 444 n. 3. An alternative is to utilize the expertise of the intervening Equal Employment Opportunity Commission to supervise settlement negotiations or to aid in determining the amount of the award.

 The period for which back pay should begin is determined by July 2, 1965 or the statute of limitations, whichever is later. The charges, on which this suit is predicated, were filed on November 22, 1965 with the Equal Employment Opportunity Commission. At that point the applicable state statute of limitations for Title VII [143] and section 1981 [144] was tolled.[145] The proper

Alabama limiting provision, Code of Alabama, Tit. VII, § 26(1) (1960),[146] for back pay for both Title VII and section 1981 sets out a one year limit. Since no claim may extend to a period prior to July 2, 1965 under either Title VII or section 1981, this date marks the beginning of the back pay period.

The termination date of the back pay period for most claimants will be the date of the district court's decree implementing our decision, but may, depending on the employee's situation, be March 31, 1971, the date testing was ended. First there will be those members of the class, either currently situated or present prior to March 31, 1971, within the predominantly black departments. They are eligible for back pay for the period 1965 to 1971 because of the restrictive effect of the discriminatory testing on their intra-department and inter-department advancement. An employee currently holding a position in these departments would also have been injured up until the date of the decree by the effect of the posting and bidding system. For those class members, currently or in the past, positioned within the predominantly white departments, back pay from 1965 to 1971 is appropriate because the testing limited their advancement within the department. Back pay may be granted from 1971 to the date of the decree to those employees because they were inhibited by the testing from transferring to these departments at an earlier time, thereby handicapping their promotion by denying them the opportunity to accrue departmental seniority. Finally, those workers in the class denied supervisory positions or entrance

icies of the Act would best be effectuated if the occasional bold plaintiff could represent his fellow workers. Thus, Title VII actions ordinarily should be treated as class actions for back pay purposes."

143. In *Georgia Power,* this Court determined that the state statute of limitations concerning wages was to apply to a back pay claim. 474 F.2d at 924.

144. See note 130, *supra* at 255.

145. *Cf.* United States v. Georgia Power, *supra,* 474 F.2d at 925.

146. This provision states:
 "All suits and actions for the recovery of wages, overtime, damages, fees or penalties accruing under laws respecting the payment of wages, overtime, damages, fees and penalties, and specifically under the act of congress known as the Fair Labor Standards Act of 1938, . . . shall be brought within 'one year after the accrual of such cause of action, . . . ."

into the apprenticeship and on-the-job training are eligible for back pay.

This Court has recently addressed the issue of the burden of proof on back pay claims in Johnson v. Goodyear Tire & Rubber Co., *supra,* 491 F.2d 1364. This Court pointed out that once a prima facie case of discrimination against the class alleged is made out, a presumption for back pay arises in favor of class members. However, this presumption was found to be tempered by an initial burden on the individual employee to bring himself within the class and to describe the harmful effect of the discrimination on his individual employment position:

"Therefore, the class represented by Johnson, having established a prima facie case of employment discrimination, is presumptively entitled to back pay. . . . Since, at the same time, the initial burden is now placed on the individual labor department employee to show that he is a member of the recognized class subject to employment discrimination, we think it is appropriate to offer some preliminary observations concerning the manner in which the presumption in favor of the class and the initial burden placed upon an individual employee may be reconciled by the district court.

\* \* \* \* \* \*

"The district court's task will be further complicated since the only criteria which Goodyear previously imposed for transfer have been found by this court to be invalid under Title VII. If an employee can show that he was hired into the labor department before April 22, 1971 and was subsequently frozen into that department because of the discriminatory employment practices established here, then we think the individual discriminatee has met his initial burden of proof unless there are apparent countervailing factors present." *Id.* at 1379.

This holding is entirely consistent with, and flows from our decision in *Georgia*

*Power* that the presumption in favor of a member of a class discriminated against does not *per se* entitle an employee to back pay without some individual clarification. 474 F.2d at 921–922.

This Court in *Goodyear,* then went on to detail the burden on the employer:

". . . It will be incumbent upon Goodyear to show by convincing evidence that other factors would have prevented his transfer regardless of the discriminatory employment practices. If Goodyear wishes to show that a labor department employee would not be qualified for any other job then its proof must be clear and convincing. Any doubts in proof should be resolved in favor of the discriminatee giving full and adequate consideration to applicable equitable principles." Id. at 1379, 1380.

There, just as in this case, our prior decision in Cooper v. Allen, *supra,* 467 F. 2d at 840, was instructive. In *Cooper,* the district court had placed the burden on the plaintiff to show, disregarding the discriminatory testing, that he was the most qualified for the job for which he was seeking back pay. This Court reversed:

"On remand the City must prove by clear and convincing evidence that, in the light of the enumerated qualifications, Cooper would not have been entitled to the job even had there been no requirement to take and pass the Otis test. That is, the City must show that the person actually hired was on the whole better qualified for the job." *Id.* at 840.

Reading these earlier decisions together, it is clear that the burden of proof formulated by this Court conceives an initial lighter burden on the back pay claimant with a heavier weight of rebuttal on the employer. Therefore, the *maximum* burden that could be placed on the individual claimant in this case is to require a statement of his current position and pay rate, the jobs he was denied because of discrimination and their pay rates, a record of his employment

history with the company and other evidence that qualified or would have qualified him for the denied positions, and an estimation of the amount of requested back pay. The employer's records, as well as the employer's aid, would be made available to the plaintiffs for this purpose. The burden then shifts to the company to challenge particular class members' entitlement to back pay.[147]

■ The method of calculating a class-wide back pay award must not be rigid. This results from the impossibility of calculating the precise amount of back pay. There is no way of determining which jobs the class members would have bid on and have obtained if discriminatory testing, seniority, posting and bidding system, and apprentice and on-the-job training programs had not been in existence. Class members outnumber promotion vacancies; jobs have become available only over a period of time; the vacancies enjoy different pay rates; and a determination of who was entitled to the vacancy would have to be determined on a judgment of seniority and ability at that time. This process creates a quagmire of hypothetical judgments. Johnson v. Goodyear Tire and Rubber Co., *supra*, 491 F.2d at 1379.

It does not follow that back pay claims based on promotions cannot be awarded. Unrealistic exactitude is not required. This Court made this principle clear in Brennan v. City Stores, Inc., 479 F.2d 235, 242 (5th Cir. 1973), involving the Equal Pay Act:

The defendant's objection to the formula used to compute back pay are numerous. . . . While the mechanics of computing back pay are difficult and alternative figures might have been used by the trial court in fashioning a remedy, whatever difficulty of ascertainment exists was due to the discriminatory wage structure maintained by the defendant. In such cases, it suffices for the trial court to determine the amount of back wages "as a matter of just and reasonable inference." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687–688, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946). "Difficulty of ascertainment is no longer confused with right of recovery." Mitchell v. Mitchell Truck Line, Inc., 286 F.2d 721 at 725–726 (5th Cir. 1961) and Hodgson v. Ricky Fashions, Inc., 434 F.2d 1261 at 1262–1263 (5th Cir., 1970). Since no single wage scale could be ascertained for women or men at Loveman's, and because the formula used by the trial court was reasonably calculated to compensate the discriminatees for their losses, we decline to require a more precise calculation in this case. *Id.* at 242.

Likewise, in Bowe v. Colgate-Palmolive Co., *supra*, 416 F.2d 711, faced with the impossibility of determining the rate of pay of the plaintiffs because of the complexities of the job bidding procedure, the court ordered back pay awards at the maximum rate which the plaintiff could have earned. 416 F.2d at 721.

Therefore, in computing a back pay award two principles are lucid: (1) unrealistic exactitude is not required,[148] (2) uncertainties in determining what an employee would have earned but for the discrimination, should be resolved

---

147. In Peters v. Missouri-Pacific Railroad Co., *supra*, 483 F.2d at 500, this Court stated:

"The Railroad claims that the back pay damages awarded plaintiff Placide duplicate in part damages previously awarded him for loss of wages in an earlier suit against the Railroad for personal injuries suffered on the job. The burden was upon the Railroad to establish its plea of estoppel by the prior state judgment."

148. Bowe v. Palmolive Co., 489 F.2d 896, 902; Brennan v. City Stores, Inc., *supra*, 479 F.2d at 242 (Equal Pay Act case); Evans v. Sheraton Park Hotel, 5 EPD ¶ 8079 at 6922–23 (D.D.C.1972). *See* Back Pay, *supra* note 117, at 764–67 nn. 151, 152, 153; Cooper and Sobol, Seniority and Testing under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. at 1634–35.

against the discriminating employer.[149] Johnson v. Goodyear Tire & Rubber Co., *supra,* 491 F.2d at 1380, n. 53.

The method of computation will be a function of the complexity of the case. If the class is small, or the time period short, or the effect of the discrimination straightforward, a fairly precise determination of what each claimant's position would have been, *but for* the discrimination, is possible. This type of individual-by-individual determination was utilized in Bing v. Roadway Express, Inc., *supra,* 485 F.2d at 452–455. Initially the employer had the burden of notifying its black city drivers, in order to determine the members of the class, that some of their members had been discriminatorily excluded from road driving positions. Since there was only one type of job involved, the class was small, and the variables, back pay period and pay rate, readily definable; the court was able to take an individual-by-individual approach. Johnson v. Goodyear Tire & Rubber Co., *supra,* 491 F.2d 1364.

However, when the class size or the ambiguity of promotion or hiring practices or the multiple effects of discriminatory practices or the illegal practices continued over an extended period of time calls forth the quagmire of hypothetical judgment discussed earlier, a class-wide approach to the measure of back pay is necessitated.[150] It should be emphasized that this is not a choice between one approach more precise than another. Any method is simply a process of conjectures.[151] When a court is

149. Bowe v. Colgate-Palmolive Co., *supra,* 272 F.Supp. 332, 365–366 (S.D.Ind.1967), rev'd., 416 F.2d at 721 (Because preciseness in computing back pay was not possible, the district court awarded the minimum which could have been earned. The Court of Appeals reversed, ordering the maximum.); Evans v. Sheraton Park Hotel, *supra,* 5 EPD ¶ 8079 at 6922–23.

In back pay cases under the National Labor Relations Act, this Court has consistently resolved uncertainties against the wrongful employer rather than the injured employee. In NLRB v. International Union of Operating Engineers, Local 925, 460 F.2d 589, 599 (5th Cir. 1972), we summarized:

"Had Ross been on the job instead of Lucas, he might just as easily have been selected. We will never know for certain, but we think this uncertainty should be resolved against respondents and not against Ross. As this court had held in an analogous situation:

'when an employer's unlawful discrimination makes it impossible to determine whether * * * employee would have earned backpay in the absence of discrimination, the uncertainty should be resolved against the employer.'

"NLRB v. Miami Coca-Cola Bottling Co., 5 Cir., 360 F.2d 569 at 572–573. See also East Texas Steel Casting Co., Inc., 116 NLRB 1336, 1339–1340 (1956), enforced NLRB v. East Texas Steel Castings Co., 5 Cir., 255 F.2d 284 (5 Cir. 1958)."

150. In *Georgia Power,* this Court was cognizable of these difficulties, and modified the language on burden of proof quoted above with the implication that a court should search for a more pragmatic method of calculation:

"The trial court's decision must also include a weighing of issues as to limitations and laches (discussed more fully below), factors of economic reality (*i. e.,* the relative expense of accurate determination of individual rights vis-a-vis the amounts involved) and, most assuredly, the physical and fiscal limitations of the court to properly grant and supervise relief. This listing is intended to be illustrative and not exhaustive. It is our intention to leave the issue altogether open for reconsideration and decision by the court below." 474 F.2d at 922.

Doubts about which individuals or whether all class members would have been promoted have called forth a class approach on remedial issues other than back pay. United States v. Bethlehem Steel Corp., *supra,* 446 F.2d at 660; United States v. Central Motors Lines, Inc., 338 F.Supp. 532, 560 (W. D.N.C.1971).

151. The process of computation and burden of proof is not an "either, or" approach. In United States v. Wood, Wire & Metal Lathers International Union, Local 46, *supra,* 328 F.Supp. at 443–445, the court had found "substantially less than total exclusion of nonwhites" from job referrals by the union. In order to grant back pay the particular black workmen entitled had to be specified. An objective criteria was used:

". . . [A] claimant will be eligible for back pay in any month during which he either (a) shaped the hiring hall for five or more days or (b) shaped the hall and/or

faced with the employment situation like this case, where employees start at entry level jobs in a department and progress into a myriad of other positions and departments on the basis of seniority and ability over an extended period of time, exact reconstruction of each individual claimant's work history, as if discrimination had not occurred, is not only imprecise but impractical.[152]

Courts have reconciled, in a class-wide approach, the complexities in computing approximate pay rates and pay periods in several ways. In Stamps v. Detroit Edison Co., *supra*, 365 F.Supp. 87, the court had defined the class and determined the back pay period, as has been done here. In order to determine the pay rate of each member of the class who had been excluded from the jobs in the five pay groups containing the "skilled trades high opportunity jobs" the court averaged the five pay rates and awarded each claimant back pay based on this averaged rate computed for pay grade progression purposes according to the number of years of employment, less the amount of interim earnings.

Another method of computation can be categorized as a formula of comparability or representative employee earnings formula. Approximations are based on a group of employees, not injured by the discrimination, comparable in size, ability, and length of employment—such as "adjacent persons on the seniority list or the average job progress of persons with similar seniority"—to the class of plaintiffs.[153] In Bowe v. Colgate-Palmolive Co., 489 F.2d 896 (7th Cir. 1973), involving a class of fifty-four women, the court approved this approach:

> In each case the problem was to determine in some reasonable fashion "the highest rate of pay for such jobs as [the employee] would have bid on and qualified for if a non-discriminatory seniority scheme would have been in existence." 416 F.2d at 721. As already observed, exact reconstruction of the work history of each employee had the system contained no discriminatory element is impossible. the district court chose a test period so as to determine on the basis of experience the jobs each employee would have performed in the absence of discrimination. The period selected was from March 9, 1970 through May 31, 1970, the twelve weeks beginning shortly after the preliminary injunction opening all jobs to women.
>
> Women who obtained the better paid general labor jobs during the test period were awarded the difference between their actual pay for time since July 2, 1965 and an amount computed for the same period on the basis of their individual hourly rate during the test period, less adjustments for contractual increases.

*Id.* at 902.

Likewise, in United States v. Wood, Wire & Metal Lathers Int. Union, Local

---

worked on a job or jobs for a total of eight or more days."

An individual claimant had to present some evidence that he qualified under these criteria. In order to determine the actual amount of back pay, however, the court switched to a class-wide approach. The court utilized the average earnings of a comparable group of white union members for the period of discrimination.

152. The key is to avoid both granting a windfall to the class at the employer's expense and the unfair exclusion of claimants by defining the class or the determinants of the amount too narrowly. For instance in

this case, actually to assume that employee #242 would have been promoted in three years to such-and-such job instead of employee #354 is so speculative as to unfairly penalize employee #354. *See* Stamps v. Detroit Edison Co., *supra*, 365 F.Supp. at 121–122. Many district courts, realizing this problem, have ordered parties to negotiate an approach and determination of back pay. *E. g.*, United States v. Georgia Power, C.A. Nos. 12355, 11723, 12185 (N.D.Ga. Jan. 31, 1974) ; Johnson v. Goodyear Tire & Rubber Co., *supra*, 349 F.Supp. at 18.

153. See Back Pay, *supra* note 117, at 764–67.

46, *supra,* 328 F.Supp. at 443–445, where the court was computing the back pay of black lathers injured by a discriminatory union referral system, a "representative employee earnings formula" was employed:

> For any month of eligibility a claimant is to receive the difference, if any, between average earnings of white union members performing outside work . . . and permit holders [a non-union lather performing only outside work] on the one hand, and the lesser amount the claimant earned or should have earned. *Id.* at 444.

The Equal Employment Opportunity Commission urges a comparability formula for this case:

> While the appropriate formula should be decided by the Master after a hearing, this Court should instruct the Master that such formula should be based upon a class of whites which would be comparable to the members of the effective class but for the discrimination. By such a formula a determination of the gross award can be established without prohibitive expense within the physical and fiscal limitations of the Court. See, United States v. Georgia Power Co., *supra,* 5 FEP cases at p. 598. Brief for the United States EEOC as amicus curiae, at 47.[154]

While the district court is not limited to this particular alternative, it has more basis in reality (i. e. actual advancement of a comparable group not discriminated against) than an individual-by-individual approach.

 Finally, the ingredients of back pay should include more than "straight salary." Interest, overtime, shift differentials, and fringe benefits such as vacation and sick pay are among the items which should be included in back pay.[155] Adjustment to the pension plan for members of the class who retired during this time should also be considered on remand.[156]

### Conclusion

 The declaratory and affirmative injunctive relief should alleviate the perpetuated effects of the company's intentional discrimination and testing and educational requirements. Back pay should compensate for economic losses suffered during the period of testing and before the implementation of this decision. Nevertheless, two additional elements of relief are necessary. The district court should establish a complaint procedure by which a member of the class may question the interpretation or implementation of the district court's decree. *See* United States v. Georgia Power, *supra,* C.A. Nos. 12355, 11723, 12185. The procedure should include the filing of a complaint with the personnel department of the company and the proper committee of the Board of Operatives (described *infra*). Finally, the district court shoud retain this case on the docket for a reasonable time to

---

154. In other words, the total award for the entire class would be determined. At that point, individual claims would be calculated on *pro rata* shares for those workers of similar ability and seniority claiming the same position, possibly eliminating the necessity of deciding which one of many employees would have obtained the position but for the discrimination. Claimants dissatisfied with their portion of the award could be allowed to opt out in order to prove that they were entitled to a larger portion. *Cf.* Fed.R.Civ.P. 23(d)(2); Protective Committee v. Anderson, 390 U.S. 414, 435, n. 17, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968).

155. *See* Bowe v. Colgate-Palmolive, *supra* 489 F.2d at 903–904 (vacation, sick pay, and bonus); United States v. Georgia Power, *supra,* 474 F.2d at 922 (travel expenses); Schattman v. Texas Employment Commission, 330 F.Supp. 328 (W.D.Tex.1971), rev'd on other grounds, 459 F.2d 32 (5th Cir. 1972), cert. denied, 409 U.S. 1107, 93 S.Ct. 901, 34 L.Ed.2d 688 (1973) (sick and vacation leave); Pettway v. American Cast Iron Pipe Co., 332 F.Supp. 811 (N.D.Ala.1970) (holiday and vacation pay).

156. Rosen v. Public Service Electric & Gas Co., *supra,* 477 F.2d 90, 95–96 (3rd Cir. 1973); United States v. Georgia Power Co., *supra,* C.A. Nos. 12355, 11723, 12185.

insure the continued implementation of equal employment opportunities.[156a] Brown v. Gaston County Dyeing Machine Co., *supra*, 457 F.2d at 1383; Parham v. Southwestern Bell Telephone Co., *supra*, 433 F.2d at 429.

## IV. BOARD OF OPERATIVES

The appellants also appeal the relief granted by the district court in disestablishing the separate black employees management board, the Auxiliary Board, and integrating the all-white employee board, the Board of Operatives. For complete understanding of this issue, an explanation of the organization of the company, as established by Mr. John J. Eagan, its founder, is necessary.

### A. *Plan of Employee Participation and Corporate Management*

The company was organized in 1922 under the "Eagan Plan," envisioning an ideal of cooperation between labor and management. The plan called for the control of business policies to be vested in a board of directors elected by the stockholders. A Board of Management, composed of corporate officers elected by the Board of Directors, conducted the day to day business of the company. The unique feature of the Eagan Plan was the Board of Operatives, composed of non-supervisory personnel elected by employees of the company. A main function of the Board of Operatives has been to advise the Board of Management on matters affecting the welfare of the employees and to provide a channel of communication between management and the employees.

During the lifetime of Eagan, candidates for election to the Board of Operatives had to be white males over twenty-one years of age, American citizens, and employed by the company in a non-supervisory capacity for three or more years. The racial restriction continued after Eagan's death. The district court found that Eagan had intended that result, although the codicil to his will did not by its terms restrict membership to whites.[157]

As an adjunct to the Board of Management and the Board of Operatives, an all black board of employees evolved to advise the other two boards on matters affecting the interest of the black employees. Voting and membership on the Board of Directors of the ACIPCO Colored YMCA and its successor, the Auxiliary Board, created in 1935, was restricted to black employees. The district court found that the Auxiliary Board would not have originated except for the racial restriction on the membership of the Board of Operatives.

From 1922 until January, 1970, the Board of Operatives and the Auxiliary Board functioned separately under the provisions of the Eagan Plan and the by-laws of the corporation. A codicil to Eagan's will had bequeathed all the outstanding common stock of the company to the members of the Board of Management and the members of the Board of Operatives, jointly, and to their successors in office. The Boards acted as trustees for the benefit of the employees and future employees of the company and their families. Similar status was not conferred on the members of the Auxiliary Board.

### B. *Desegregation of the Employee Boards*

In finding the segregation of black and white employees into two boards illegal, the district court stated:

However, the passage of Title VII of the Civil Rights Act of 1964 presents,

---

156a. We feel it particularly appropriate to call attention to the final decree in the three named *Georgia Power Co.* cases. Upon remand of this court, 474 F.2d 906, the district court permitted the parties to prepare a suitable means of effectuating the judgment of this Court. The resulting decree may well be a model for other trial courts to use with appropriate modifications in back pay cases.

157. All employees, without regard to race, were eligible to vote in the Board of Operatives elections.

in the judgment of this Court, a novel case of first impression. Assuming the propriety and lawfulness of the operation of the Eagan Plan at Acipco prior to July 2, 1965, the issue is presented concerning the effect on the Eagan Plan of the new and overriding legislative policy of Title VII which now controls the employment practices of all private corporations covered by the Act. Title VII now prohibits, in no uncertain terms, any discrimination by an employer with respect to compensation, terms, conditions or privileges of employment because of an individual's race or color. The Court believes that the right to serve as a member on the Board of Operatives at Acipco has been, since the inception of the Eagan Plan, a valuable term, condition, or privilege of employment at Acipco and therefore falls within the express coverage of Title VII, 42 U.S.C.A. § 2000e–2(a). 332 F.Supp. at 815.

The court then declared the racial restriction on membership on the Board of Operatives unlawful, but directed that it continue its functions, as a joint stockholder, co-trustee, and management advisor, representing *both* black and white employees with no racial restriction on its membership. The Auxiliary Board was ordered to be abolished simultaneously with the elimination of the racial restriction on the membership of the Board of Operatives. The district court, however, was conscious of the fact that the ratio of black employees to white employees was approximately one to two and that if voting should polarize along racial lines no black employee would be elected to the Board of Operatives under the present electoral districts, established in 1959. Therefore, the court ordered the company to draw up new electoral districts. The court also added:

As a caveat, the Court points out that the election district arrangement should not be drawn or gerrymandered for the purpose of either depriving or guaranteeing any employee of a particular race or color the right to serve on the Board of Operatives. This would be contrary not only to the spirit and letter of the original Eagan Plan and Trust, but also to the provisions of Title VII and the prevailing law. Such arrangement of election districts must be on genuine geographical, operational and functional grounds in the manner contemplated by the Eagan Plan so that employees throughout the plant will have the opportunity of electing fellow employees working in their own areas or districts to the Board of Operatives on a fair basis. 332 F.Supp. at 817.

The company submitted a plan which enlarged the number of electoral districts from five to twelve with one representative elected from each district. The district court approved this plan finding that the districts "had been organized and are based on genuine geographical, operational and functional grounds without any intention or purpose to gerrymander the districts because of racial considerations." 332 F. Supp. at 819. Black employees of the company have boycotted each election held subsequently because they consider the elections pursuant to the company's plan unfair and illegally constituted. The black employees now submit their objections to this plan to this Court on appeal. We affirm the district court's order.

Appellants maintain that the district court's order is inadequate to remedy the unlawful exclusion of black employees from this segment of the management structure. They point to the record of the racially discriminatory practices employed by the company under its all-white management. The district court's notation of the low ratio of black employees to white employees, which means less black votes, is claimed to be a result of the practices condoned by the company's management which should not continue to penalize black employees. Second, appellants point out that a primary purpose of the Board of Operatives is to act as a channel of communication for employees. They postulate that 33%

of the company's work force, all of the black employees, will go unrepresented if the clear majority of white employees is allowed to rule. Finally, in assuming that the Board of Operatives will have substantial responsibility in monitoring the compliance with Title VII, appellants challenge the *bona fides* of persons who have condoned and been the beneficiaries of the company's prior discriminatory practices. Appellants rely on Fifth Circuit precedent ordering equal black and white representation in elective offices and committees in merging previously segregated unions. *E. g.,* Long v. Georgia Kraft Co., *supra,* 455 F.2d 331; United States v. Jacksonville Terminal Co., *supra,* 451 F.2d at 457–458. Cumulative voting on a plant-wide basis and a two-thirds voting requirement for the Board of Operatives is requested.

The appellants' position has several strengths. The Board of Operatives, as co-trustees of the stock of the company, jointly, with the Board of Managers, elects the Board of Directors,[158] who are ultimately responsible for the company's policies and who elect the Board of Managers, the day to day operators of the company's business. The Board, therefore, shares the responsibility for the company's past employment practices. In addition, the Board of Operatives will be the main recipient of any complaints concerning compliance with the relief granted by the court. Therefore, input by black employees is vital. However, the district court has correctly applied the law in this case,[159] and we do not think it has abused its discretion in granting relief.

There is no racial gerrymandering claimed by the appellants.[160] Since the date of the district court's order, the number of black employees has increased to approximately 50% of the company's work force. In addition, in the first election after the district court's order, the statistics reveal that black employees were in a majority in three of the electoral districts and constituted a substantial percentage in two others.[161] To allow cumulative voting would defeat the valid company policy of alloting representation along geographical and functional lines. Cumulative voting would also result in at-large elections. Courts in the reapportionment area have frowned upon the use of at-large districts while endorsing single electoral districts. White v. Regester, 412 U.S. 755, 765–770, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973); Connor v. Johnson, 402 U. S. 690, 91 S.Ct. 1760, 29 L.Ed.2d 268 (1971). Finally, at-large elections would encourage voter polarization by race. We are seeking to apply a law whose purpose is to resolve employment inequalities resulting from racial discrimination rather than emphasize race as an employment · or voting criterion.

However, in affirming the order of the district court, we are mindful of the responsibility the Board of Operatives will bear in aiding the implementation of the affirmative relief that the trial court will order. To the extent possible with the procedure which the district court will direct on remand, we think it

---

158. The record clearly indicates that before the death of Mr. Eagan two of the members of the Board of Operatives were elected directly to the Board of Directors. The record, however, does not state whether this practice continued after the death of Mr. Eagan.

159. The Equal Employment Opportunity Commission evidently determined that the company had violated 42 U.S.C.A. § 2000e–2(a) by "maintaining a segregated Board of Operatives which performs the functions of a labor organization and may not be segregated under the Civil Rights Act of 1964." The district court did not reach this issue (332 F.Supp. at 815 n. 3), nor do we.

160. *Cf.* Steele v. Louisville & Nashville Railroad Co., 323 U.S. 192, 65 S.Ct. 226, 89 L. Ed. 173 (1944) (racial gerrymandering and unfair representation by the white majority of the firemen's union).

161. The data indicates that in these other two districts plus three more, eligible black voters outnumbered the total votes received by the successful candidate because of the light turnout for voting.

appropriate that a bi-racial committee of employees, operating as an agency of the Board of Operatives, be appointed to deal with this matter. *Cf.* Ellis v. Board of Public Instruction of Orange County, 423 F.2d 203, 206, n. 4 (5th Cir. 1970). The members of this committee should be drawn from the ranks of the Board of Operatives and the Equal Employment Opportunity Committee. The committee would be available to receive employee complaints and aid in compliance with Title VII. It could report both to the Board of Operatives and to the district court, so long as it retains jurisdiction, on equal employment problems.

The judgment is reversed and the case is remanded to the trial court for further proceedings not inconsistent with this opinion.

BELL, Circuit Judge (specially concurring):

I concur in the result reached in the extended majority opinion to the extent that the result relates to the errors assigned. The result is in accord with the previous decisions of the Supreme Court and of this Court and is, with respect to each assignment of error, consonant and well within the interstices which the courts have been called upon to fill in administering Title VII, and in giving effect to the remedial aim of Congress which was expressed in enacting Title VII.

I do not join in those advisory portions of the opinion (pp. 260–264), having to do with determining back pay for the class. I prefer to wait for a concrete case involving an award of back pay before deciding whether the suggested approaches are valid in law. They may or may not be employed. Damage awards must be individualized to avoid constitutional problems which would arise in taking the property of one for another without a showing of loss to the particular recipient. This would not, of course, preclude a settlement by consent decree on terms suitable to the parties and which do not ov-

erreach the members of the class. The Georgia Power Company order referred to in Fn. 156(a) of the majority opinion is an example of such a consent decree.

I do not perceive the holding of the majority as going beyond what the court said in Johnson v. Goodyear Tire & Rubber Company, 5 Cir., 1974, 491 F.2d 1364. There the court held that each member of the class, black employees hired before April 22, 1971, had been the victim of discriminatory testing and diploma requirements and transfer policies. The court placed the burden on those claiming back pay to establish membership in the class. The burden was then to shift to the employer to show that the particular claimant would never have transferred regardless of the discriminatory employment practices. The court went on to say:

"Our holding does not necessarily mean that every member of the class is entitled to back pay. Individual circumstances vary and not all members of the class are automatically entitled to recovery. There should be a separate determination on an individual basis as to who is entitled to recovery and the amount of such recovery. It is clear that all members of the class have been subject to unlawful racial discriminatory practices. Therefore, those who have suffered a loss of pay because of such practices are entitled to appropriate compensation. . . ."

The *ratio decidendi* of *Goodyear* avoids the constitutional problem which would inhere in an approach, for example, of comparing the total remuneration of one class with that of another class, e. g., black employees versus white, for the period of discrimination and simply allocating the difference amongst the class suffering the discrimination regardless of individual financial loss.

The controlling principle for determining back pay here is set out on the majority opinion at page 259. The principle stated does not conflict with the

burden of proof rule of *Goodyear* but is a more definitive statement of the same principle and gives greater assurance of individualizing each claim. The majority statement is as follows:

". . . the *maximum* burden that could be placed on the individual claimant in this case is to require a statement of his current position and pay rate, the jobs he was denied because of discrimination and their pay rates, a record of his employment history with the company and other evidence that qualified or would have qualified him for the denied positions, and an estimation of the amount of requested back pay. The employer's records, as well as the employer's aid, would be made available to the plaintiffs for this purpose. The burden then shifts to the company to challenge particular class members' entitlement to back pay."